ROBBINS ARROYO LLP
BRIAN J. ROBBINS (admitted *pro hac vice*)
CRAIG W. SMITH (admitted *pro hac vice*)
JENNY L. DIXON (admitted *pro hac vice*)
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
jdixon@robbinsarroyo.com

*Co-Lead Counsel for Plaintiffs*

SCHNEIDER WALLACE COTTRELL
   KONECKY LLP
MICHAEL C. MCKAY (SBN 023354)
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0141
Facsimile: (866) 505-8036
mmckay@schneiderwallace.com

*Co-Liaison Counsel for Plaintiffs*

[Additional Counsel Listed Below]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE NUVERRA ENVIRONMENTAL SOLUTIONS, INC. DERIVATIVE SHAREHOLDER LITIGATION<br><br>This Document Relates To:<br><br>All Actions. | ) Lead Case No. CV-13-01933-PHX-NVW<br>)<br>) **VERIFIED CONSOLIDATED**<br>) **SHAREHOLDER DERIVATIVE**<br>) **COMPLAINT**<br>)<br>)<br>)<br>) Honorable Neil V. Wake |

Plaintiffs Matthew D. Kennedy, Mark Mutton, and George Partilla ("Plaintiffs"), by and through their undersigned attorneys, submit this consolidated derivative complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiffs for the benefit of nominal defendant, Nuverra Environmental Solutions, Inc. ("Nuverra" or the "Company"). Plaintiffs assert claims against certain the Company's officers and its directors (collectively, "Individual Defendants"). Plaintiffs seek monetary and non-monetary remedies for breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that have caused grievous injury to Nuverra's reputation, goodwill and standing in the capital markets, among other damages.

2. For the second time since its formation less than seven years ago Nuverra is suffering the brutal consequences of reckless acquisition strategies spearheaded by Nuverra founder and Executive Chairman Richard J. Heckmann ("Heckmann") and blindly approved by Nuverra's quiescent Board of Directors (the "Board"). The Board once again utterly failed to exercise oversight over Nuverra's management, core operations, financial and internal controls, and public disclosures. The Individual Defendants' systematic disregard of duty permitted the publication of a series of grossly misleading statements to shareholders about Nuverra's financial performance, strategic risks and future prospects. The Individual Defendants breached their fiduciary duties by repeatedly touting the Company's strong growth and purported positive financial outlook while withholding material negative information regarding adverse events and trends that were undermining the Company's financial performance and growth prospects. The Individual Defendants masked these negative trends in Nuverra's core operations through a steady stream of hasty acquisitions that were undertaken with little due diligence and wholly inadequate oversight and controls, and which saddled the Company with unmanageable debt and marginal assets. The Individual Defendants knew or, but for the exercise of reasonable diligence, would have known from prior action by members of the

1

Board that the most recent failures to institute and follow good corporate internal control was exposing Nuverra and its shareholders to financial harm resulting from the breaches of fiduciary duties.

3. Defendant Heckmann founded the Company, formerly known as Heckmann Corporation, with directors Lou L. Holtz ("Holtz"), Alfred E. Osborne ("Osborne"), and J. Danforth Quayle ("Quayle") in 2007 as a special-purpose acquisition company ("SPAC").[1] Defendant Heckmann knew the co-founders from their service on the boards of two prior companies that he had grown through aggressive acquisition strategies, US Filter, Corp. and K2, Inc.

4. The Company's sole purpose was to vet and acquire profitable businesses. It completed its Initial Public Offering ("IPO") in November 2007, raising $430 million for potential acquisitions. Defendant Heckmann identified the Company's first target in early 2008, China Water and Drinks Inc. ("China Water"). China Water was a roll-up of quickly acquired Chinese water bottling companies. Defendant Heckmann hyped the opportunities in China and told investors that the acquisition would capture the enormous growth evident in the broader China economy. But defendant Heckmann and his fellow directors Holtz, Osborne and Quayle, who comprised the entire Board at that time, failed to conduct adequate due diligence and ignored a series of red flag warnings about serious anomalies in China Water's operations and financial and accounting controls, and recommended that shareholders approve the acquisition. By 2009, China Water had been exposed as a fraud, forcing the Company to write down 96% of the $625 million purchase price and to defend a securities class action and derivative litigation.

5. Following the China Water debacle, defendant Heckmann looked to reinvent the Company and change investors' perceptions. This began with a new focus

---

[1] A SPAC is a publicly-traded buyout company that raises money in order to pursue the acquisition of an existing company. SPACs raise blind pool money (most of which goes into a trust) from the public for an unspecified merger, sometimes in a targeted industry. Typically, if an acquisition is not made in two years, the money is returned to the original investors.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

on waste water servicing in the Nation's booming natural gas industry and eventually led to a name change from Heckmann Corporation to Nuverra. This boom was driven by the spread of a new extraction process commonly known as "fracking." Fracking extracts natural gas from shale by injecting fresh water at high pressures to release the natural gas from shale and other substrates. Lacking industry experience or any related operations, Nuverra's strategy focused on assuming enormous debt to fund acquisitions and roll-ups of other companies involved in servicing the oil and gas exploration and production operators in shale basins across the United States. Nuverra's acquisitions included trucking companies to transport fresh water to natural gas drilling sites and then remove toxic waste water, and those that provide equipment and tank rentals and storage. The Board ignored management's failure to integrate operations and internal controls for the acquired companies. While Management touted its acquisitions, the Individual Defendants knew, or, through the exercise of reasonable diligence would have known, that the various companies Nuverra had acquired continued to operate as independent entities. The members of the Board consciously disregarded the fact that, in the absence of standard controls and reporting processes, erroneous revenue recognition and billing and timekeeping data multiplied across the Company, making reliable consolidated reporting all but impossible.

6. Compounding these problems, the Individual Defendants caused the Company to pay significant premiums for acquisitions made at the height of surging interest in the industry. The Individual Defendants knew that the constant stream of disparate acquisitions had made it extremely difficult to determine the performance of each acquired set of operations, let alone to report accurately consolidated results for Nuverra or to reliably differentiate between actual organic growth and growth that was merely a roll up of the dubious results reported by the recently acquired companies. Defendants Heckmann, Chief Executive Officer and Vice Chairman Mark Johnsrud ("Johnsrud") and Chief Financial Officer Jay Parkinson ("Parkinson"), with the blessing of the Audit Committee Defendants who reviewed and approved the Company's financial

statements and earnings releases, consciously elected to mask these problems by refusing to disclose detailed information regarding the Company's core operations differentiated from the recently acquired operations, despite pointed questions from skeptical financial analysts. As a result, the current and future valuations being provided to investors in the 2012-2013 timeframe were utterly unreliable and based on unrealistic financial performance and growth expectations. This opacity permitted the Individual Defendants to convey a highly misleading impression of effective integration and strong growth. Indeed, by mid-2012, goodwill and intangibles accounted for approximately 95% of Nuverra's reported equity value. The truth was that Nuverra consisted of a multitude of poorly managed, unrelated and non-integrated companies that faced fast-rising costs and declining margins due to competition from other service providers and the oil exploration and production operators themselves.

7. During the second half of 2012 and the first half of 2013, Nuverra continued its purchasing spree, despite having accumulated over $550 million in debt and failing to generate sufficient cash flow from operations to service this debt, creating a substantial risk that Nuverra would violate its credit facility covenants. The Individual Defendants, who regularly attended Board meetings and received detailed non-public reports on Nuverra's actual financial performance and growth, understood that Nuverra's financial guidance and public statements inaccurately and misleadingly portrayed the Company's operations and financial condition. The Company had little to no ability to accurately forecast revenues given the lack of processes. Billing practices that allowed truck drivers to record revenue subsequently required hefty write-downs to correct improper revenue recognition.

8. The Individual Defendants knew that the Company's financial guidance was unreasonably optimistic and unrealistic because: (a) Nuverra suffered from numerous, serious undisclosed operational problems, including its lack of internal controls and structure; (b) contrary to the Company's public statements, its poor results were not the result of external factors, but were caused by the undisclosed operational

problems; (c) certain of the Company's recent large acquisitions were not performing as projected, substantially undermining the Company's ability generate revenue and EBITDA; and (d) the Company was overleveraged and in danger of breaching key covenants in its credit facilities.

9. Rather than disclose the Company's true condition and the enormous risks to its future performance, the Individual Defendants knowingly concealed, or permitted concealment of the true state of Nuverra's business from the Company's investors. Throughout 2012 and 2013, the Individual Defendants repeatedly reported touted Nuverra's business expansion and forecasted strong growth. As recently as May 2013, defendant Johnsrud announced the Company was "on track to meet [its] financial and operational objectives for 2013 and [was] seeing early signs of solid momentum." Defendant Johnsrud misleadingly claimed that the Company was experiencing solid organic growth and growth from added operations. This was fiction. In truth, fundamental operations problems, undisclosed by the Individual Defendants, had brought the Company to the brink of financial calamity.

10. On July 30, 2013, the true state of Nuverra's financial condition began to surface. The Company issued a press release announcing its "preliminary" second quarter 2013 financial results. Nuverra disclosed that it believed its adjusted EBITDA for the quarter would be $32-33 million and revenues would be $165.5 million. Guidance had been for $46.7 million in adjusted EBITDA and revenues of $186.4 million. The Company blamed the poor results on: (i) weakness in the used oil market; (ii) heavy snow and rain that hampered performance in April and May of 2013 (after boasting that it was on track to meet financial and operational objectives for 2013 despite weather problems); (iii) certain unspecified operational difficulties; and (iv) heavy demand in certain shale areas, which had forced the Company to hire subcontractors, lowering overall margins. On this news, Nuverra's stock dropped nearly 13%, erasing more than $115 million in market capitalization in one day.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

11.     A week later, on August 8, 2013, the Company announced its actual second quarter financial results, disclosing an adjusted earnings per share ("EPS") loss of $0.05, nearly twice the loss of $0.03 that Nuverra had led the investment community to expect. The Company claimed the shortfall was a result of "slower ramp up by [exploration and production] operators across all shale areas; extraordinarily cold and wet weather conditions in the Bakken Shale area [the Company's largest base in operation]; execution issues in the Eagle Ford Shale; hiring challenges in the Marcellus/Utica Shale areas; and underperformance in [the Company's] Industrial Solutions business."  The Individual Defendants continued to blame external factors for disappointing results and to assure investors, as they had for nearly a year, that a turnaround was just around the corner: "*we feel confident [as yet-unearned revenue] will be deferred into the second half of the year and into '14.*"[2]

12.     On August 23, 2013, financial analysts at *SeekingAlpha.com* published the results of its investigation in a research report entitled, "Nuverra Environmental: A Sinking Ship With Default Risk."  The article systematically debunked the Company's uniformly positive statements and detailed the facts regarding the Company's unserviceable debt load, the difficulties the Company was having in integrating and properly accounting for its acquisitions, and increased competition that the Individual Defendants had withheld from, or soft peddled in statements to, shareholders.  The report highlighted the poor integration and lack of controls that had made it impossible for Nuverra to generate accurate forecasts.  The Company had missed Defendants' guidance "by over 35% for three years in a row ... despite making a number of acquisitions to fill holes," making it another "[r]ollup gone wrong."

13.     These revelations caused Nuverra's market capitalization to plummet another 18.7%, erasing an additional $132 million in market capitalization in just a few days.  In total, between July 29, 2013 and August 28, 2013, the Company's market

---

[2] Here, as throughout, all emphasis is added unless otherwise noted.

capitalization plunged more than 35%, wiping out more than $323 million in shareholder value.

14. On November 7, 2013, the extent and magnitude of the unfolding debacle became clear when the Individual Defendants were forced to disclose disastrous financial results for the third quarter of 2013. While its key competitors saw their revenue from fluids management improve or stay flat, Nuverra's earnings declined. The Company would also finally acknowledge that it had been overstating the value of its acquisitions for years, announcing that it would take a non-cash charge of ***$233 million*** including goodwill and long-lived asset impairment. The Company announced that it would sell Thermo Fluids Inc. ("TFI") at a large loss just one year after acquiring the company for $245 million, in order to pay down its enormous debt before loan covenants were breached. At the time of the acquisition, Defendant Heckmann touted TFI as having "a strong business model with robust and predictable revenue, EBITDA and operating income that [would] contribute to [the Company's] top and bottom lines immediately." Defendant Heckmann told shareholders that TFI would comprise 31% of 2012 revenues. A quarter after the closing, defendant Heckmann assured investors that the TFI acquisition "is everything we expected it to be, and assimilation of their strong executive team has been smooth."

15. During the investor conference call held November 7, 2013 to discuss the third quarter 2013 results, defendant Johnsrud hinted at the true source of Nuverra's problems: "I have concluded it is time for the Company to move forward and ***put legacy issues behind us***. As such, ***we've taken a number of one-time, non-cash, nonrecurring charges***." Investors were stunned. The Company's poor results over the prior year had been primarily attributed to external factors such as weather, while any operational problems were minimized. Few "legacy issues" affecting Nuverra's operations had been disclosed, let alone problems of such a magnitude that they would require the massive write down.

16.     The truth is that, for most of 2012 and all of 2013, the Individual Defendants knew that Nuverra faced enormous undisclosed operations problems that were compounded by the Company's reckless acquisitions. These problems included: (a) rapid additions of new employees to address high trucker turnover, not growth in the Shale Solutions segment; (b) a billing system so riddled with problems that customers were routinely refusing to pay bills amounting to millions of dollars per quarter due to false and inflated charges; (c) collapsing rental rates for tanks and other rental products due to competition and over-supply; (d) customers abandoning Nuverra's solutions in favor of investments in their own systems for gathering and disposing of water used in fracking due in part to Nuverra's inefficiencies and overcharging; (e) under-performing acquired assets in the weak used oil market; (f) serious labor, billing, and infrastructure problems at the Eagle Ford operations, which had been portrayed as "a fantastic basin for everybody," but was actually the source of over $1.5 million in falsified billings Nuverra had reported as revenue; and (g) the use of high-priced subcontractors at the Marcellus and Utica shale plays due to labor problems arising from driver turnover that had been plaguing the Company since at least mid-2012.

17.     The Director Defendants (defined herein), through attendance at Board and committee meetings where the operational difficulties were reviewed in detail, as well as internal financial reports, had actual knowledge of the true state of Nuverra's finances and growth prospects, and knew that the Company's public statements were incomplete and misleading. The Director Defendants nonetheless breached their fiduciary duties of loyalty, good faith, and candor by determining not to halt or correct the misstatements and permitting the Company to violate its financial reporting obligations.

18.     As a direct result of the Individual Defendants' misleading statements and wrongdoing, the Company is the subject of a securities class action lawsuit (the "Securities Action") that poses the risk of hundreds of millions of dollars in additional potential damages to the Company.

19. Despite the enormous damage Nuverra has suffered, the Board has not commenced and will not commence suit against Individual Defendants for their breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiffs bring this action to protect the Company's interests and hold its fiduciaries accountable.

**JURISDICTION AND VENUE**

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

21. Venue is proper in this Court because Nuverra maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**A.     Plaintiffs**

22. Plaintiff Kennedy was a shareholder of Nuverra at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current Nuverra shareholder. Plaintiff Kennedy is a citizen of New York.

23. Plaintiff Mutton was a shareholder of Nuverra at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current Nuverra shareholder. Plaintiff Mutton is a citizen of Illinois.

24. Plaintiff Partilla was a shareholder of Nuverra at the time of the wrongs complained of, has continuously been a shareholder since that time, and is a current Nuverra shareholder. Plaintiff Partilla is a citizen of Pennsylvania.

**B.     Defendants**

25. Nominal defendant Nuverra is a Delaware corporation that maintains its principal executive offices at 14646 N. Kierland Blvd., Scottsdale, Arizona. Nuverra's

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

common stock trades on the New York Stock Exchange under the symbol "NES." Nuverra is currently in the oilfield services business, delivering fresh water and collecting, treating, recycling and disposing of waste water in connection with natural gas drilling. Much of its business entails trucking and equipment rental.

26. Defendant Heckmann, has been the Executive Chairman of Nuverra's Board of Directors since November 2012 and previously served as CEO and Chairman from May 2007 through November 2012:

(a) Defendant Heckmann founded the Company in 2007, and it bore his name until May 2013, when shareholders approved the Company's rebranding as Nuverra. In connection with the closing of the Company's acquisition of and merger with Power Fuels in November 2012, defendant Heckmann stepped down as CEO. From the Company's inception until November 2012, defendant Heckmann had been responsible for the general management, oversight, leadership, supervision and control of day-to-day business and affairs of the Company;

(b) According to Nuverra's Proxy Statement filed April 5, 2013 ("2013 Proxy"), defendant Heckmann was appointed Executive Chairman, which the Proxy claimed afforded the Company significant expertise in the water industry, finance and accounting, acquisitions, and corporate governance and risk management practices central to the Board's duties;

(c) The 2013 Proxy states that, as a director, defendant Heckmann was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(d) Defendant Heckmann knowingly, recklessly, or with gross negligence: (i) made misleading statements in the Company's conference calls, press

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(e)     Nuverra paid defendant Heckmann the following compensation as an executive:

| Year | Salary | Total |
|------|--------|-------|
| 2012 | $511,538 | $511,538; |

(f)     Defendant Heckmann is named as a defendant in the Securities Action, where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's financial results;

(g)     Defendant Heckmann is a citizen of California.

27.     Defendant Johnsrud has served as the Vice Chairman of the Board and CEO since November 2012:

(a)     Defendant Johnsrud was formerly the CEO of Badlands Power Fuels, LLC ("Power Fuels"), which Nuverra acquired through merger in November 2012. Defendant Johnsrud currently controls 38% of Nuverra as a result of the transaction.  He also obtained the right to a seat on the Board for himself and to require that the number of seats on the Board be increased from nine to ten, and to make an appointment to fill that seat;

(b)     The Company's 2013 Proxy claims that defendant Johnsrud has significant management experience and expertise with respect to the environmental services industry, and, in particular with the successful implementation of growth strategies in this business making his service as Vice Chair of the Board and CEO appropriate.  As CEO, defendant Johnsrud is responsible for the general management, oversight, leadership, supervision and control of day-to-day business and affairs of the Company;

(c)     According to the 2013 Proxy, as a director of Nuverra, defendant Johnsrud is responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on

11

understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(d)     Defendant Johnsrud knowingly, recklessly, or with gross negligence: (i) made misleading statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(e)     Nuverra paid defendant Johnsrud the following compensation as an executive:

| Year | Salary | Total |
|------|--------|-------|
| 2012 | $58,333 | $58,333; |

(f)     Defendant Johnsrud is named as a defendant in the Securities Action, where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's financial results;

(g)     Defendant Johnsrud is a citizen of Arizona.

28.     Defendant Osborne is a Nuverra director and has been since May 2007. Osborne is one of the founders of Nuverra:

(a)     Defendant Osborne is also Chairman of Nuverra's Audit Committee and has been since at least 2008;

(b)     According to the 2013 Proxy, as a member of the Audit Committee, defendant Osborne is charged with assisting the Board in fulfilling its responsibility to oversee (i) the integrity of the financial statements of the Company, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence, and (iv) the performance of the Company's independent registered public accounting firm and internal audit function;

(c)     Defendant Osborne knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(d)     Defendant Osborne is also a member of the Nominating Committee. According to the 2013 Proxy, as a member of the Nominating Committee, which is responsible for corporate governance, defendant Osborne is responsible for developing continuing education programs for the Board, reviewing corporate governance principles and providing recommendations to the Board regarding possible changes; overseeing, discussing with our Board and management; and, making recommendations to the Board regarding how to address, risks relating to management and Board succession planning, ethics, corporate governance and business practices;

(e)     The 2013 Proxy states that, as a director, defendant Osborne was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(f)     Nuverra paid defendant Osborne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $8,000 | $72,100 | $80,100; |

(g)     Defendant Osborne is a citizen of California.

29.     Defendant Quayle is a founder of Nuverra and has served as a director since May 2007:

(a)     The 2013 Proxy states that, as a director, defendant Quayle was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding

13

the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(b)     Defendant Quayle is the Chairman of both the Compensation Committee and the Nominating Committee.  According to the 2013 Proxy, as a member of the Nominating Committee, which is responsible for corporate governance, defendant Quayle is responsible for developing continuing education programs for the Board, reviewing corporate governance principles and providing recommendations to the Board regarding possible changes; and overseeing, discussing with our Board and management, and, as necessary, making recommendations to the Board regarding how to address, risks relating to management and Board succession planning, ethics, corporate governance and business practices;

(c)     Defendant Quayle knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(d)     Nuverra paid defendant Quayle the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2012 | $72,100 | $72,100; |

(e)     Defendant Quayle is a citizen of Arizona.

30.     Defendant Holtz is a founder of Nuverra and has served as a director since May 2007;

(a)     The 2013 Proxy states that, as a director, defendant Holtz was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of

particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(b)     Defendant Holtz is a member of the Compensation Committee and the Nominating Committee.  According to the 2013 Proxy, as a member of the Nominating Committee, which is responsible for corporate governance, defendant Holtz is responsible for developing continuing education programs for the Board, reviewing corporate governance principles and providing recommendations to the Board regarding possible changes; and overseeing, discussing with our Board and management, and, as necessary, making recommendations to the Board regarding how to address, risks relating to management and Board succession planning, ethics, corporate governance and business practices;

(c)     Defendant Holtz knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(d)     Nuverra paid defendant Holtz the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2012 | $72,100 | $72,100; |

(e)     Defendant Holtz is a citizen of Florida.

31.     Defendant Kevin L. Spence ("Spence") has served as a director of Nuverra since December 2010.  Defendant Spence is a member of the Audit Committee and has been since December 2010:

(a)     According to the 2013 Proxy, as a member of the Audit Committee, defendant Spence is charged with assisting the Board in fulfilling its responsibility to oversee (i) the integrity of the financial statements of the Company, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence, and (iv) the performance of the Company's independent registered public accounting firm and internal audit function;

(b)     Defendant Spence knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(c)     The 2013 Proxy states that, as a director, defendant Spence was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(d)     Nuverra paid defendant Spence the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $4,000 | $72,100 | $76,100; |

(e)     Defendant Spence is a citizen of Arizona.

32.     Defendant Edward A. Barkett ("Barkett") has served as a director since 2009.  Defendant Barkett is a member of the Audit Committee and has been since at least 2010:

(a)     According to the 2013 Proxy, as a member of the Audit Committee, defendant Barkett is charged with assisting the Board in fulfilling its responsibility to oversee (i) the integrity of the financial statements of the Company, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence, and (iv) the performance of the Company's independent registered public accounting firm and internal audit function;

(b)     Defendant Barkett knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

1    (c)    The 2013 Proxy states that, as a director, defendant Barkett was

2 responsible for overseeing the management of Nuverra's business and charged with

3 staying informed about the Company's operations, with an emphasis on understanding

4 the key enterprise risks affecting the Company's business, through regular reports

5 directly from key operating, finance and legal officers responsible for oversight of

6 particular risks within the Company and updates during the year relating to risks and risk

7 controls, including quarterly comprehensive corporate risk reports;

8    (d)    Nuverra paid defendant Barkett the following compensation as a

9 director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $4,000 | $72,100 | $76,100; |

12    (e)    Defendant Barkett is a citizen of California.

13    33.    Defendant Robert B. Simonds, Jr. ("Simonds") is a Nuverra Vice Chairman

14 and has been since October 2010, and is a director and has been since May 2010:

15    (a)    According to the 2012 Proxy, as a director of Nuverra, defendant

16 Simonds was responsible for overseeing the management of Nuverra's business and

17 charged with staying informed about the Company's operations, with an emphasis on

18 understanding the key enterprise risks affecting the Company's business, through regular

19 reports directly from key operating, finance and legal officers responsible for oversight of

20 particular risks within the Company and updates during the year relating to risks and risk

21 controls, including quarterly comprehensive corporate risk reports;

22    (b)    Defendant Simonds knowingly or recklessly failed to implement

23 adequate internal controls and procedures to ensure the accuracy of the Company's

24 disclosures;

25    (c)    Nuverra paid defendant Simonds the following compensation as a

26 director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2012 | $72,100 | $72,100; |

17

(d)     Defendant Simonds is a citizen California.

34.    Defendant Andrew D. Seidel ("Seidel") is a Nuverra director and has been since 2008:

(a)     The 2013 Proxy states that, as a director, defendant Seidel was responsible for overseeing the management of Nuverra's business and charged with staying informed about the Company's operations, with an emphasis on understanding the key enterprise risks affecting the Company's business, through regular reports directly from key operating, finance and legal officers responsible for oversight of particular risks within the Company and updates during the year relating to risks and risk controls, including quarterly comprehensive corporate risk reports;

(b)     Defendant Seidel knowingly or recklessly failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(c)     Nuverra paid defendant Seidel the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2012 | $72,100 | $72,100; |

(d)     Defendant Seidel is a citizen of California.

35.    Defendant Jay C. Parkinson ("Parkinson") is Nuverra's Executive Vice President and Chief Financial Officer and has been since September 2012:

(a)     According to the 2012 Proxy, as Chief Financial Officer, defendant Parkinson is charged with developing the Company's overall financial structure, including the financial and accounting controls for all Nuverra's operating subsidiaries. As Chief Financial Officer, he is also responsible for all finance and accounting related functions of the Company and its operating subsidiaries, including SEC reporting and Sarbanes-Oxley compliance;

(b)     Defendant Parkinson is also named as a defendant in the Securities Actions, which allege that he violated sections 10(b) and 20(a) of the Exchange Act;

(c)     Defendant Parkinson knowingly, recklessly or with gross negligence: (i) made misleading statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (2) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures;

(d)     Nuverra paid defendant Parkinson the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2012 | $120,000 | $300,000 | $798,000 | $648,000 | $1,866,000; |

(e)     Defendant Parkinson is a citizen of Arizona.

36.     Defendants Johnsrud, Heckmann, Simonds, Seidel, Spence, Osborne, Quayle, Holtz, and Barkett are referred to herein as the "Director Defendants." Defendants Johnsrud and Parkinson are referred to as the "Officer Defendants." Osborne, Barkett, and Spence are referred to herein as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

37.     By reason of their positions as officers, directors, and/or fiduciaries of Nuverra and because of their ability to control the business and corporate affairs of Nuverra, defendants owed Nuverra and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Nuverra in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Nuverra and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.     To discharge their duties, the officers and directors of Nuverra were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Nuverra were required to, among other things:

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

(a)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     ensure that no inaccurate financial information about Nuverra was released to the public that would tend to artificially inflate Nuverra's stock or that would cause corresponding or greater harm to the Company's value when the truth was revealed;

(d)     ensure that there were sufficient checks, balances, and controls in Nuverra's accounting, finance, and operational functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of financial prospects;

(e)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

(f)     remain informed as to how Nuverra conducts its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**Company Code of Business Conduct and Ethics**

39.    Nuverra maintains a Code of Business Conduct and Ethics, applicable to all Company employees and directors, to promote "[f]ull, fair, accurate, timely and understandable disclosure in reports and documents" filed with the U.S. Securities and Exchange Commission ("SEC") and issued by the Company.

40.    The Code of Business Conduct and Ethics includes the following principles:

Corporate Assets

- Each Covered Person should protect the Corporations' assets and ensure that the Corporation's assets are used for the benefit of the Corporation.

Disclosure and Compliance

- Each Covered Person should be familiar with the disclosure requirements generally applicable to the Corporation;

- Each Covered Person should not knowingly misrepresent, or cause others to misrepresent, facts about the Corporation to others, whether within or outside the Corporation, including to the Corporation's directors and auditors, and to governmental regulators and self-regulatory organizations, such as the New York Stock Exchange;

- Each Covered Person should, to the extent appropriate within his or her area of responsibility, consult with other officers and employees of the Corporation with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Corporation files with, or submits to, the SEC and in other public communications made by the Corporation; and

- It is the responsibility of each Covered Person to promote compliance with the standards and restrictions imposed by applicable laws, rules and regulations.

**Additional Duties of the Audit Committee Defendants**

41.    The Charter of Nuverra's Audit Committee has stated since at least June 16, 2011 that the Audit Committee's purpose is to:

[P]rovide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries, including, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors and the Corporation's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Corporation's annual proxy statement.

42.    Under the June 16, 2011 Audit Committee Charter, the Audit Committee Defendants (defendants Barkett, Osborne, and Spence) owed specific duties to assist the Board in overseeing, among other things, the integrity of the Company's financial statements and the adequacy and effectiveness of the Company's accounting and internal controls, policies, and procedures.   The Audit Committee Defendants were further required to review the information to be included in Nuverra's earnings press releases, as well as the financial information and earnings guidance the Company provided to analysts and ratings agencies.

**Additional Duties of the Nominating Committee Defendants**

43.    According to the 2013 Proxy, the Nominating Committee is responsible for monitoring the Company's corporate governance, developing continuing education programs for the Board, reviewing corporate governance principles and providing recommendations to the Board regarding possible changes; and overseeing, discussing with the Board and management, and, as necessary, making recommendations to the Board regarding how to address, risks relating to management and Board succession planning, ethics, corporate governance and business practices.   As such, the Nominating Committee Defendants (defendants Quayle, Holtz, and Osborne) owed specific duties to assist the Board in overseeing the integrity of the Company's corporate governance and business practices.

44.    To discharge their duties, the officers and directors of Nuverra were required to exercise reasonable and prudent supervision over the management, policies,

practices and controls of the Company. By virtue of such duties, the officers and directors of Nuverra were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

45. Defendants, because of their positions of control and authority as directors and/or officers of Nuverra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Nuverra, each of the defendants had knowledge of material non-public information regarding the Company.

**Breaches of Duties**

46. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Nuverra, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or reckless in not knowing posed a risk of serious injury to the Company.

23

47. The Individual Defendants breached their duty of loyalty and good faith by causing, or allowing defendants to cause, the Company to make misleading statements regarding its financial performance and growth prospects. Due to the Individual Defendants' illegal actions and course of conduct, the Company wasted its corporate assets and is now the subject of the pending Securities Actions. Nuverra has expended, and will continue to expend, significant sums of money as a result of the Individual Defendants' wrongdoing.

48. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Nuverra, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Nuverra has expended, and will continue to expend, significant sums of money and management resources, including in defense of the Securities Actions, efforts to bring debt-levels within acceptable range and efforts to remediate the Company's financial and internal controls.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Nuverra, regarding the defendants' management of the Company's operations and the prospects of the Company's business; and (ii) enhance the defendants' executive and directorial positions at Nuverra and the

profits, power, and prestige that the defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the defendants, collectively and individually, took the actions set forth herein.

51. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue misleading financial statements.

52. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**PLAINTIFFS' INVESTIGATION**

55. Plaintiffs' counsel's investigation into the claims alleged herein was based on a review of publicly available information, including Nuverra's filings with the SEC, wire and press releases by and regarding Nuverra and other relevant entities, Nuverra

teleconference transcripts, business and news media articles, financial and securities analyst reports and interviews of certain former Nuverra employees.

56.    On multiple occasions, Plaintiffs' counsel interviewed one former Nuverra employee (referred to hereinafter as "CW").  CW worked at Nuverra from January 2012 until June 2013.  CW held two positions during his/her tenure:  Operations Manager and Business Unit Manager.  At various times during his/her tenure at Nuverra, CW reported to John Love, a Business Unit Manager, Kyle Lewis, an Area Manager, and ultimately Charles Gordon, Nuverra's Executive Vice President and Chief Operating Officer.

57.    CW's duties included managing the driver pool, facilities, and daily operations.  CW joined Nuverra to facilitate and improve processes from top to bottom in his/her region, including for timekeeping, inventory control, billing and tracking systems, because the Company had literally no structures in place.  During CW's tenure, he/she implemented timekeeping and attendance processes, as well as structured purchasing programs.

58.    CW and the business unit managers for other divisions participated in weekly "Monday" conference calls to discuss what the Company was and was not doing well, what needed to be improved and how, and whether the Company was showing the right EBITDA margins, and whether it was meeting its goals.  The calls were run by COO Gordon and included other senior executives such as then Chief Financial Officer W. Christopher Chisholm, Sean Mason, lead controller, Michael Welch, Vice President of Operations, and Damien Georgino, Vice President of Legal.

59.    CW prepared monthly and quarterly forecasts and revenue reports, P&L reports, and equipment utilization reports, among others.  CW understood that these reports were combined with those from other divisions, rolled up, and presented to Gordon and then provided to CEO Heckmann and ultimately shared with the Board.  This understanding is based on quarterly meetings that CW would attend at which each division would share its forecast and revenues.  CW reports that reliable forecasting was nearly impossible during 2012.

60.     CW also conducted monthly financial reviews with then CFO Chisholm via conference call from April 2012 through his/her departure in June 2013.

61.     CW reported to then CFO Chisholm and then COO Gordon that he/she had discovered approximately $1.5 million improperly posted to revenue because of duplicated billings.

62.     CW was tasked with rectifying a large accounts receivable balance. CW determined that because of failed processes, the Company had an $800,000 miss in labor costs for which there were no revenues to off-set. Defendant Heckmann attended an on-site meeting with Gordon and CW to discuss the root cause and presentations CW had prepared.

63.     CW also accompanied defendants Heckmann and Johnsrud on visits to Nuverra operations in various shale basins during the due diligence process for the Power Fuels transaction.

**SUBSTANTIVE ALLEGATIONS**

64.     Nuverra claims to provide full-cycle environmental solutions to customers in energy and industrial end-market in the United States. The Company's Shale Solutions segment provides comprehensive environmental solutions for unconventional oil and gas exploration and production, including the delivery, collection, treatment, recycling, and disposal of restricted environmental products used in natural gas fields in the following shale areas: (a) Marcellus/Utica; (b) Eagle Ford; (c) Bakken; (d) Haynesville; (e) Barnett; (f) Permian; (g) Mississippian Lime; and (h) Tuscaloosa Marine. The Company's Industrial Solutions segment provides environmental and waste recycling solutions through collection and recycling services for waste products, including used motor oil, oily water, spent antifreeze, used oil filters, and parts washers. This segment offers its services through a network infrastructure of hundreds of tanker trucks, vacuum trucks, trailers, and railcars.

65.     On March 8, 2012, the Company issued a press release announcing its full year 2011 results and providing its 2012 forecast. The Company reported $156.8 million

in revenue and adjusted EBITDA of $28.6 million. Although Nuverra barely achieved 2011 revenue guidance ("revenues in excess of $150 million"), it substantially missed its adjusted EBITDA guidance of $40 million. The Company projected the following for 2012:

> Heckmann expects to achieve pro-forma total revenues of between $400.0 million and $420.0 million, and pro-forma adjusted EBITDA of between $95.0 million and $105.0 million.

66. Also on March 8, 2012, the Company announced that it had signed a definitive agreement to acquire TFI, an environmental services and waste recycling company primarily engaged in the collection and recycling of used motor oil, for $245 million in cash and shares of Company common stock. In Nuverra's press release, defendant Heckmann, the Company's CEO at that time, stated:

> ***TFI has a strong business model with robust and predictable revenue, EBITDA and operating income growth that will contribute to our top and bottom lines immediately***. We expect approximately 31% of our revenues in 2012 to come from recovered and reprocessed used oil and other environmental services from Thermo Fluids.

67. Nuverra announced it had completed the acquisition of TFI on April 10, 2012. In its press release, the Company stated:

> ***The addition of TFI extends Heckmann's single-source environmental solutions offering for the oil and gas industries, beyond water services solutions***. This new business segment will be called Heckmann Environmental Services, or HES, and will be a "one-stop" shop for collection and recycling services of waste products, including used motor oil, wastewater, spent antifreeze, remanufactured antifreeze sales, used oil filters and parts washers. "Three years ago, we established a business model for environmental service solutions. We built this foundation with our total water and wastewater solutions for the shale oil and gas industry. ***Acquiring the largest seller of preprocessed fuel oil from recovered used motor oil, or UMO, in the Western United States represents our next phase of growth***," said Richard J. Heckmann, Chairman and Chief Executive Officer of Heckmann Corporation. "***We can now provide more comprehensive service offerings among the environmental services spectrum. HES augments our proven capabilities in water and wastewater services by diversifying our operations, revenue stream, geographic reach and customer base, while accelerating our top-line growth and providing us with significant free operating cash flow***." Including HWR and HES, Heckman pro-forma 2011 financial results would have been $270.6 million in revenues. Assuming three quarters of operations, Heckmann expects its HES business segment to generate revenues between $105 and $115 million for the nine-month period beginning in April 2012.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

68.     On August 6, 2012, Nuverra issued a press release announcing its results for the second quarter of 2012.  This press release was the first in pattern where Company representatives made inaccurately optimistic statements about the Company's business prospects, concealed the poor performance of recent acquisitions, and misleadingly stated that poor results were attributable to temporary external factors.  In reality, fundamental problems with the Company's business model and execution caused the weak results, which were not temporary or cyclical, and recent acquisitions were not performing as had been projected.  The release stated in part:

"*In the second quarter, we significantly improved our business, generating top- and bottom-line growth across our environmental service offerings*, and simultaneously improved our gross margin from 13% to 17% and our EBITDA margin from 19% to 21%," said Mr. Richard J. Heckmann, Chairman and Chief Executive Officer of Heckmann Corporation. "While the natural gas industry continues to be challenging, *our water business remains healthy. In the second quarter, well completion activities were delayed in several key areas temporarily slowing our trucking, piping and disposal revenue growth opportunities. However, we expect completion activities in the affected areas to improve in the second half of 2012*."

"While the Haynesville rig count over the last 18 months has declined from over 120 to under 40, our pipeline volume has grown incrementally, with average barrels per day increasing by 20% sequentially in the second quarter to approximately 50,000 barrels per day, and we saw days with a record of nearly 60,000 barrels/day in the second quarter. These encouraging volumes, along with increased natural gas pricing, indicate that the gas market may be stabilizing. In addition, we have recently completed the acquisition of a saltwater disposal well in the Marcellus/Utica Shale area and construction of a disposal well to serve the Tuscaloosa Marine Shale area, both of which should be operational in the third quarter. *With our expansion into additional basins, we believe our sequential growth will continue throughout the year*."

\* \* \*

"The TFI acquisition, now Heckmann Environmental Services (HES), *is everything we expected it to be, and assimilation of their strong executive team has been smooth*. As we work to integrate services for our customers, we see multiple opportunities for bundling our environmental service offerings and for taking advantage of the economies of scale available to us. The stability, low capital intensity and strength of that business combined with the exciting growth characteristics and expanding markets in the water business provide our company with a unique combination of complementary services, *as well as strong and growing cash flow*."

\* \* \*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

In the second quarter of 2012, HWR generated steady growth through a combination of securing long-term contracts and volume commitments in the gas basins and expanding operations in the oil and liquids-rich basins. During the second quarter, HWR began operating two new saltwater disposal wells in the Eagle Ford Shale area and initiated water treatment services in the Eagle Ford Shale area at an HWR well site for the treatment and reuse of flowback and produced water. **These technologically advanced water treatment services will allow HWR to provide full service offerings in the Eagle Ford Shale area**.

69.     This press release ultimately proved to be inaccurate and misleading when, approximately one year later, it became clear that among other things, the Company was not growing as stated and the weak results were not caused by temporary external factors but by concealed problems within the Company.

70.     Also on August 6, 2012, the Company held an earnings conference call to discuss the second quarter results with analysts and investors.  During the call, defendants made the following misleading statements:

[Defendant Heckmann:]

Good afternoon, everybody. I went back over the weekend and read previous quarter earnings and releases and the comments and questions and concluded that building a company from scratch is fairly messy business.  I do understand some of the confusion as to what we're doing, so **I'm going to try and bring some perspective to our actions and show you where we're headed through the rest of the decade**.

Our second quarter reported revenues of $91 million, and adjusted EBITDA of $19.3 million was a bit shy of our projections given 5 months ago, **primarily because several completion jobs slid into July after the Fourth of July holiday**. However, **we do expect them to be back online in the second half**. Without question, our customers have pulled back capital spending and competition for the remaining jobs has intensified.

* * *

**All of our water customers have a need for the TFI services**, now referred to as our Environmental Services business and they now use competitors. We are in the process of reconciling yard, personnel, and other issues to be able to expand the environmental businesses across our system.

* * *

**Marcellus/Utica is now our largest basin, with Haynesville second and the Eagle Ford third**. Most of the $2 million in onetime start-up costs were evenly distributed between the Marcellus and the Eagle Ford.  For those of you who saw the AP story today, the Marcellus and Haynesville are now close to either as the 2 largest producers of natural gas in the country.

*Without question, we built the most solid competitive position in these basins.*

*       *       *

[Analyst:]

Maybe if you could talk about what trends you're seeing in Q3. And *what gives you confidence that you're going to see some of these jobs hit in the second half?*

[Charles R. Gordon ("Gordon"), President and Chief Operating Officer:]

What happened in June, in particular, in Q2, is we had a couple of major customers or producers in the Marcellus that had frac schedules that looked like they were going to be pretty robust beginning around the 1st of June. In fact, in both cases, in one case, they relocated and are doing more business in the wet gas area of the Marcellus and are just beginning to pick up now. In the second case, they went to multiple frac crews on July 7. So, *we are seeing the delay probably cost about a month, maybe six weeks. But we see both companies' activity picking up dramatically as we move into August.*

*       *       *

[Analyst:]

A couple of questions. First one is for Chuck. Chuck, *is the entire shortfall* from $100 million down to $92 million in revenue *due to the pushbacks of these jobs?*

[Gordon:]

*No. We had -- that's a significant portion of -- because we also had nice growth in the Eagle Ford. It wasn't quite what we projected and the challenges in the Eagle Ford are building our organization fast enough to keep up with market demand and provide a quality product. So it was a combination of very nice growth in the Eagle Ford, but not quite where we projected along with some of the challenges that we saw in the Marcellus due to the delays.*

[Analyst:]

Okay. *The startup costs*, we're excluding them from the EBITDA. Yet, this is a fairly dynamic market where things change fairly frequently within three- and six-month periods. *What gives you guys the confidence of essentially taking what is an item that is increasingly looking like a recurring item, and saying that it is non-recurring?* Will it really be a non-recurring item going forward? Will it reduce? Do you see it going away next year? Help us understand that a little bit.

*       *       *

31

[Defendant Heckmann:]

… [I]f you look at the quarter-over-quarter growth of 23% in Marcellus and 57% in the Eagle Ford, I mean, we're not going to grow 57% a quarter in the Eagle Ford, and we're not going to grow at 23% forever in the Marcellus. To get 57%, there's a lot of hiring, there's a lot of training, there's a lot of driver's training for 2 and 3 weeks in the right seat. There is -- we brought in literally trailer after trailer after trailer for affordable housing. We run vans from San Antonio to the Eagle Ford until we can get people housing. We do the same thing in the Marcellus. So *I don't think it's fair to say that these are costs that are going to be there every quarter, because we just have so much growth*. And until the infrastructure gets in place up there, we don't have any choice but to spend money that you wouldn't ordinarily spend if you were adding 5 drivers, but we're adding 50.

* * *

[Analyst:]

I'm looking carefully through the press release and maybe I missed it, but I don't think I did. Have we dropped giving guidance?

[Defendant Heckmann:]

*Our view is that we know that the following quarters will be larger than this quarter*. The problem is, *we're having a hard time figuring out where the producers are going with their budgets*. And it's just become very difficult with the stops and starts that we are seeing to plan as far out as we thought we could plan six months ago. *So, you're right. We don't have guidance in there. I wouldn't rule out the kind of year we thought we were going to have, but I wouldn't bet on it either* because I just don't know where things are going here in terms of growth, and in terms of the budgets of the customers. *I know our business gets better every quarter. It will be better next quarter than it was this quarter.* It is just getting very difficult with the economic issues and with the budget issues. It is getting very difficult to figure out where they're going.

[Analyst:]

…[W]ould you mind telling me if we were able to strip out the acquisitions in each business? I know that there's not much with on the TFI side, but *what does the organic growth look like in the water business and what does it look like in the -- on a pro forma basis in TFI this quarter, year-over-year?*

[Gordon:]

This is Chuck Gordon. *In the water business, the organic growth rate was around 8% quarter-over-quarter*. And the rest of the growth rate was due to a full quarter of the KBI [ph] acquisition and a partial quarter of the Harmony acquisition.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

[Analyst:]

Okay. How did the -- on a pro forma basis, how did the TFI business do?

[James Devlin ("Devlin"), President and Chief Operating Officer of Heckmann Environmental Services:]

Yes, year-over-year, Q2, including what we brokered through third-party oil *was up almost 3% and most of that to your point is organic*.

\* \* \*

[Analyst:]

Talking about the Eagle Ford, you mentioned in an earlier question, that the Eagle Ford wasn't as robust as you hoped, just due to just getting infrastructure and assets in place. At least that's the way I interpreted it. Aside from hiring labor and getting people situated, is the LNG infrastructure not there yet to get the trucks going? What are the key limiting factors there?

[Gordon:]

*Right now it's mostly around hiring and training drivers*. As Dick mentioned, we have to get them hired, take them through safety training, take them through driver training. And even on the heels of that, you have a significant period of time before they are fully productive once they're out in the field on their own. So most of our infrastructure challenges in the Haynesville have been around hiring drivers -- I'm sorry, in the Eagle Ford -- have been bringing our driver corps up to speed, from a training, safety and productivity perspective.

\* \* \*

[Analyst:]

So you guys raised $325 million 3 months ago and were providing quarterly and full year guidance at the time. But now 3 months later you've withdrawn guidance. Can you help me understand what's changed over that period?

[Defendant Heckmann:]

*Well, I'm not so sure we -- I wouldn't put it that way*. I think that anybody who has watched what's happened in the oil and gas business over the last 6 months knows lots has changed... And *I can only say that I know business gets better from here*, but it is just hard to determine where the customers are going to go here. And where their capital budgets are going to go. Can you tell me if we're going to go over the fiscal cliff? If we go over the fiscal cliff, what do you think is going to happen?

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

[Analyst:]

Let me ask it this way. How can you possibly make acquisitions -- and you made one in this past quarter -- without the visibility you think you need to make a projection on your own business?

[Defendant Heckmann:]

In the businesses we acquire -- again, remember, we are buying companies with customer lists and with customers that they operate with every day. And *that business doesn't change much*. The question is, how many rigs are going to be drilling? How much completion is there going to be? What is the overall economic demand going to be that is going to drive the price of the commodity that drives the price of the drilling? *When we make acquisitions in the new basins, they are with established customers, and we don't make them unless we've talked to those customers to know that that business is an ongoing business*. It's a complicated game out there right now to determine what, in fact, the market is going to give us.

71.     The foregoing statements in the August 6, 2012 press release and conference call inaccurately portrayed the state of the Company's operations, including in the Eagle Ford and the prospects of the TFI acquisition, and the causes of the quarterly revenue miss.  In reality, the Director Defendants, through information presented at Board meetings, including quarterly reports from the various business units and reports from defendant Heckmann who had visited particular operations and learned first-hand of the billing and revenue recognition problems, were aware, or should have been aware, that operational problems at Eagle Ford were much more serious and widespread than simply "hiring and training drivers," that the TFI acquisition was already showing signs of poor performance, and that the Company's expressed certainty that business would improve was contradicted by fundamental problems with the Company's operational execution.

72.     Indeed, the promise of growth and strong cash flow on both sides of the business – shale solutions and industrial solutions – was unrealistic.  Defendant Heckmann knew first-hand the magnitude of problems in the Company's processes.  There were deficiencies in the processes for revenue recognition, collections, inventory tracking and customer billing across all business segments.  Defendant Heckmann

participated in a meeting in mid-2012 at Eagle Ford Shale in which he learned how

process failures created an $800,000 revenue miss due to improper labor costs.

73.     On September 4, 2012, the Company issued a press release announcing that

it had entered into a definitive merger agreement with defendant Johnsrud, owner and

founder of Power Fuels.  Under the agreement, Nuverra would merge with Power Fuels.

When the merger was consummated, defendant Heckmann would become Executive

Chairman and defendant Johnsrud would become a Vice Chairman of the Board and the

Company's CEO.  The press release stated in part:

> The business combination accelerates Heckmann's strategy of providing a one-stop-shop for comprehensive environmental solutions. ***The merger is expected to be highly accretive to Heckmann's earnings per share*** and is expected to close in the fourth quarter of 2012.
>
> * * *
>
> Through June 30, 2012, Power Fuels generated trailing 12-month revenues of approximately $363.5 million and trailing 12-month adjusted EBITDA of approximately $154.7 million. Under terms of the Agreement, Heckmann plans to pay $125.0 million in cash and 95.0 million shares of the Company's common stock, subject to, among other things, a two-year lockup agreement and a two-year standstill agreement. Heckmann will also assume/refinance approximately $150 million in Power Fuels' debt. The Company is in discussions with its current lending group to expand the size of its credit facility to accommodate the transaction.
>
> The transaction significantly expands Heckmann's total environmental solutions operations. ***The business combination is expected to double Heckmann's annual revenue, extend its geographic reach and broaden Heckmann's customer base***. The combined Company will continue to expand its environmental service offering by leveraging the respective strengths of each organization, including the recently acquired Thermo Fluids Inc. business with its environmental recycling expertise. The combination is expected to create value for the stockholders through:
>
> * ***Immediately and materially increasing earnings per share***;
>
> * Providing immediate access to the fast growing and oil-focused Bakken Shale area and expanding the Company's leverage to oil – on a pro-forma combined basis, over 70% of current shale-related revenues are derived from oil and liquids basins;
>
> * ***Continuing to expand the recurring-revenue base of the Company***;

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

- Establishing an industry-leading management team by combining the Power Fuels team and their extensive operating expertise with the existing Heckmann team;

- Creating a Company with a leading presence and nationwide customer support network in all major shale areas including the Bakken, Haynesville, Marcellus, Eagle Ford, Permian and Utica;

- Leveraging complementary and significant operating and tax benefits; and,

- ***Providing additional cash flow generation to support future growth***.

\* \* \*

"Just three years ago, in the Summer of 2009, we set out to build the largest environmental services company in the United States, operating in a completely new market segment. ***We are well down that path, and one billion dollars in revenue is within our reach***," said Mr. Richard J. Heckmann, Chairman and Chief Executive Officer of Heckmann Corporation. "Producers in the U.S. shale basins are extremely focused on environmental solutions and looking for what we offer – a large nationwide company with dedicated services to handle their environmental needs. Our multi-basin presence allows us to migrate and expand with our customers as they further develop their shale assets. As their results show, the Power Fuels team is comprised of top-tier operators, and they will significantly complement our operating team. Together, we have constructed a nationwide footprint with approximately 3,000 employees and an expanding environmental services offering. We are the only company that we know of offering all of the above. ***In addition, our proprietary paperless tracking, billing and regulatory reporting capabilities, along with our access to the latest treatment technologies, sets us apart from others entering this new segment***."

Mr. Heckmann continued, "In addition, ***our earlier acquisition of Thermo Fluids and its recycling expertise now becomes a critical element in leveraging our comprehensive environmental solutions services***. We will not only manage all facets of water transport, re-use, treatment and disposal, but also provide recycling services including closed-loop solid waste management, oil reclamation, antifreeze collection and re-manufacturing, oil filter collection and recycling, and tank bottom and oily waste treatment for a diverse customer base that seeks to consolidate their supplier base. Our executives and managers are some of the most experienced in the environmental business and understand the issues around the recycling, treatment, movement and disposal of fluids connected with domestic energy. ***We believe we have built a truly unique and expansive full-service environmental services business and have now added significant scale and operating experience***."

74. This press release proved to be inaccurate and misleading when, approximately one year later, it became clear that the Company was nowhere close to reaching the revenues defendant Heckmann promised and continued deficiencies in

operations and processes, which made financial forecasting impossible and demonstrated that his claims that the Company's capabilities were wishful as opposed to factual.

75.     On October 24, 2012, the Company announced that it would offer $150 million in 9.875% Senior Notes due 2018.  Nuverra stated that the proceeds from the offering would be used to partially finance the Power Fuels merger.

76.     On November 9, 2012, the Company issued a press release announcing its results for the third quarter of 2012.  For the quarter, the Company reported $93.1 million in revenue, and adjusted EBITDA of $17.3 million.  The release stated in part:

> "***The Power Fuels merger significantly enhances our Company and gives us a leading environmental position in the Bakken Shale area, an oil basin in North Dakota,***" commented Mr. Richard J. Heckmann, Chairman and Chief Executive Officer of Heckmann Corporation. "Our customers are telling us loud and clear what they want from us – a national, multi-basin, professional environmental services company that can transport, treat, recycle and dispose of their waste products with a one-stop, full cycle solution. By merging with Power Fuels, we have an operating presence and transportation and logistics network in every significant unconventional basin. We will have immediate size and scale, and over 70% of our shale-related revenues of our combined businesses will be derived from oil and liquids exploration, which will mitigate the impact of low natural gas prices on our business."
>
> * * *
>
> "***In the third quarter, we continued to improve our business despite a challenging operating environment,***" said Mr. Heckmann. "We increased our revenue in both our Fluids Management and Recycling divisions while spending minimal capital and more than doubling our cash balance."
>
> "As we said in our second quarter call, we saw a difficult business outlook looming for the second half of 2012 due to low natural gas prices, and geopolitical concerns, as well as an uncertain political environment in the U.S., including the lack of resolution surrounding the 'fiscal cliff,' all of which impacted the spending decisions of our customers. ***Additionally, a number of our customers spent a considerable amount of their 2012 budgets in the first half of the year, and due to these factors, were not inclined to increase budgets in the second half of the year***. We significantly cut our own capital expenditures and built our cash position as a result."
>
> "***The fact that we were able to grow our revenue during the quarter while spending minimal capital speaks to the differentiation of our business model, as well as the recurring nature of our revenue stream***."
>
> * * *

In the Eagle Ford Shale, the Company continues to grow its operations with driver head count growing 26% during the third quarter. The Company now has 5 disposal wells, up from 3 at the beginning of the year, with an additional two approved disposal well permits in hand and believes that this shale basin will continue to provide growth in the coming quarters.

* * *

**The Recycling Division[3] continues to perform strongly for the Company** generating third quarter revenues of $33.8 million and has exceeded the Company's expectations relative to when the acquisition occurred in April of 2012. During the third quarter of 2012, revenue for HES increased over the third quarter of 2011 by over 14%. In the third quarter, generator volume was up slightly year-over-year. Total oil volume sold was down slightly **due to rail delivery disruption associated with Hurricane Isaac and less oil purchased from third party collectors**. During the quarter, the division finalized a new contract with one of the largest oil re-refineries in the United States, which will contribute approximately $5 million in incremental annualized EBITDA. The Company also significantly increased its sales headcount in California to improve penetration in this new geographic market, which has developed an annualized growth pipeline in excess of the annualized pro forma volume collected by the Company's recent acquisition. In the fourth quarter, the Company is bringing on-line an antifreeze remanufacturing plant, which will double its plant capacity, and an oil filter processing plant in Texas. **The projects are expected to generate ROIC of approximately 120% and 60%, respectively. The Company is very positive about the trajectory of this business moving forward**.

77.     Also on November 9, 2012, the Company conducted an earnings conference call to discuss its third quarter results with investors and analysts. During the call, defendants made the following misleading statements:

[Gordon:]

We had a solid quarter in the Eagle Ford. **We continued to add drivers**, we have 26% more drivers at the end of the quarter than we had at the beginning of the quarter. And we ramped up the driver population to support one of our big integrated customers that asked us to increase our presence on their site by about 60%. We're just starting that ramp up now. We really didn't see the benefit of the ramp up until November. But we started adding drivers throughout the quarter.

Secondly in the Eagle Ford, and this goes back to mirroring some of the product lines that Power Fuels have, we've become very, very aggressive in expanding our product offers. We're doing a lot more work around rigs, hauling both mud and cuttings, and also in the rental business.

And finally, in the Eagle Ford, we have two significant Power Fuels customers that have asked us to work with them in the Eagle Ford and **we're starting to see the benefit of leveraging some of the good**

---

[3]     The Recycling Division refers to the TFI business.

*relationships that Power Fuels has in North Dakota with some of the same producers that are operating down in the Eagle Ford.*

\* \* \*

In the Marcellus shale, we have two big, large producers that we do have contracts with, that we do a lot work with. The contract in the northern Marcellus is very stable. The one in the southern Marcellus, **we expect to grow by about 50% over the next six months.** We've been hiring drivers right along to invest in that growth.

And both these large producers have very stringent operating requirements for being on their site. So the investment we need to make in training and in drivers is significant before they can work on the customers' acreage. **But we will see significant growth over the next six months.**

\* \* \*

[Devlin, President Recycling Division:]

If you'll go to slide 15, again, **another great quarter for the Recycling Division, formerly Thermo Fluids**. And I'd like to really recognize the executive team at Thermo Fluids. Ted Sinclair, overseeing the operations. Mark Kuleck, Chief Financial Officer. And also Todd Bogart, our Chief Marketing Officer. Along with great field leadership from our regional managers. They put in another solid quarter. And **they continue to build on gains in the business that we're really excited about where it's going**.

\* \* \*

[Defendant Heckmann:]

If you go to the final page 18, the Power Fuels integration along with our Company. We've never competed with [defendant Johnsrud]. We've not had any overlap with customers where we had to compete. **So the transition should be seamless**. We're going to maintain our existing regional offices, maximizing best practices, obviously

\* \* \*

[Analyst:]

Two questions now for Mark, and Chuck here, as well. If we look at the EBITDA margin for the Power Fuels business, it's obviously a step down from where it was upon the announcing of the deal. And you disclosed a lot of that in your filings. I get that. I was just wondering what, Mark, you were seeing that was really the driver of that margin decline. When we say that's a more normalized, could we get back up over 40% when activity re-accelerates? Or what do you mean by normalized exactly, would be my single-point question?

\* \* \*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

[Defendant Heckmann:]

[W]e made this transaction knowing that there was a spike in the Bakken. And we knew what his normalized margins were, and so did Mark. And as you properly point out, we pointed those out very specifically in the proxy materials. And we would rather deal with a normalized margin. I think the answer is mid-30%s, is his normalized margins.

\* \* \*

[Analyst:]

I'm really interested on the recycling side -- TFI. Obviously the recycling of sand, mud, drill cuttings, I think that's exactly where TFI is looking to go and expand your product offering. How big is that market? What type of margins are people getting? And what do you need to expand the TFI recycling to start getting into the other markets? What needs to be done to expand that?

[Devlin:]

We're currently fine-tuning the size of the market. It was more significant than we even imagined. So we're very comfortable that we could make this drill cutting and mud, *we could make this a $500 million to $750 million a year business* and still have market share less than 10% or 15%. So *we see plenty of room to run there*.

78.    The foregoing statements in the November 9, 2012 press release and related conference call failed to accurately describe the Company's operations in the Eagle Ford, severely exaggerated the prospects for TFI and the Recycling Division, and conveyed an optimism and sense of certainty regarding the Company's future performance for which there was no reasonable basis and which was contradicted by facts known to the Director Defendants through their participation in regular Board meetings, or recklessly disregarded by them.

79.    On November 30, 2012, the Company announced that the merger with Power Fuels had been consummated.  The press release stated:

As a result of the merger, Heckmann paid $125 million in cash and issued 95 million shares of the Company's common stock to the owner of Power Fuels. The shares are subject to a two-year lockup agreement and a two-year standstill agreement and are not available for any type of borrow or exchange. In addition, in connection with the transaction, Heckmann repaid all of Power Fuels' outstanding debt obligations totaling approximately $150 million. The Company also closed on the previously announced $325 million amended revolving credit facility.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

80. According to Nuverra's proxy statement filed on April 5, 2013, the Board met twice during 2012 and the non-management members of the Board held five executive sessions. The Audit Committee held four meetings during the past year. Upon information and belief, during these meetings, the defendants were given operational updates related to the health of the Company. These operation updates contained information related to the true financial state of Nuverra that contradicted the very optimistic public statements that Company representatives and press releases were conveying to the public.

81. Upon information and belief, the Board and the non-management directors continued to meet with similar frequency during 2013 and continued to be provided with operational updates containing information that contradicted the Company's public statements.

82. On February 12, 2013, Devlin submitted his resignation as President of the Recycling Division.

83. On March 11, 2013, the Company issued a press release reporting its financial and operating results for the fourth quarter and fiscal year ended December 31, 2012. The press release reported fourth quarter 2012 revenues of $113.2 million and adjusted EBITDA of $14.7 million. For fiscal 2012, the Company reported revenues of $352 million and adjusted EBITDA of $61.6 million. The Company also reported a net profit of $5 million for the fourth quarter 2012 and $2.5 million for fiscal 2012. The press release stated in part:

> "2012 was a year of transformation and growth for our Company," said Richard J. Heckmann Executive Chairman of Heckmann Corporation. "*Our merger with Power Fuels has considerably broadened the scope of our business*. We increased our revenues by 124% to $352.0 million and our Adjusted EBITDA by 116% to $61.6 million compared to 2011, based on both our M&A activity as well as growth from our legacy businesses. *We now have a national Company that is well positioned to build on the significant investment we have made in our logistics network to meet our customers' demand for comprehensive environmental solutions, including in solid waste.*"

> \* \* \*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

"*Despite anticipated challenges in the second half of the year, the Power Fuels business outperformed our expectations*," said Mark D. Johnsrud, Chief Executive Officer and Vice Chairman of Heckmann Corporation. "The proxy statement filed on October 9, 2012 included projections for second half 2012 revenues of $180.1 million and EBITDA of $57.8 million. Unaudited financial results for the second half of 2012 for the Power Fuels business were revenues of $173.2 million and EBITDA of $62.3 million."

Jay C. Parkinson, Executive Vice President and Chief Financial Officer of Heckmann, commented, "The quarter was impacted by a number of non-recurring and one-time items. During a transitional quarter and despite general activity slowdowns and one month of contribution from Power Fuels, our fourth quarter results reflected Adjusted EBITDA in excess of our capital expenditures, and *we continued to grow our cash position during the quarter. We have hit an inflection point on capital expenditures – we have invested to build our network, and are now at the point where we can begin to leverage that investment, so our capital expenditures should be much lower going forward. Our liquidity position is strong* with over $16.2 million in cash on hand and over $177.0 million available under our revolver."

\* \* \*

In the Bakken Shale area, overall activity levels were down in the fourth quarter, although at levels not as significant as management originally estimated. Despite the slowdown in activity, overall pricing and utilization levels in the fourth quarter were better than management's expectations. As production increases, operators continue to look for efficiencies. *To meet customer requirements, the Company is expanding its operations and hiring additional personnel*.

\* \* \*

In the Marcellus and Utica Shale areas, revenue expectations were exceeded due to activity with two large customers. *The Company continues to expand operations in the Marcellus and Utica Shale areas, and continues to hire drivers and plans to add an additional fluid disposal facility in the area to satisfy 2013 demand*.

In the Eagle Ford Shale area, *delivery and collection activity increased sequentially, as the Company began work for a large customer. Results were impacted by incremental costs incurred to hire and train new drivers in anticipation of 2013 growth*.

Recycling Division (includes Thermo Fluids business)

Revenues for the fourth quarter decreased approximately 1.2% relative to the same period in 2011. Reprocessed Fuel Oil ("RFO") volumes for 2012 decreased approximately 3.4% relative to 2011, *primarily due to issues relating to the continuing tightening in the availability of rail cars and logistics in the transportation of RFO to re-refinery outlets. The general economic slowdown in the fourth quarter along with normal seasonal slowness, including a reduction in demand from asphalt markets, resulted in weakness in margins*.

\* \* \*

42

2013 Outlook & Financial Guidance

"*We believe the challenges of 2012 are subsiding* - capital budgets are being reset and we see increased momentum from high oil prices," stated Mr. Johnsrud. "The efficiency gains we saw in 2012 reduced the drilling and completion costs of a well for our customers. This is a positive for Heckmann as it makes drilling more economic for our customers, and in turn drives demand for our environmental solutions."

\* \* \*

Mr. Johnsrud continued, "As we look into 2013, our outlook is driven by the following factors:

- We operate in a market that has a strong growth profile. As shale assets are consolidated by major oil and gas companies with strict environmental standards, our positioning as a national environmental solutions provider will continue to be an advantage to us relative to regional and non-environmental companies.

- We believe there are significant operational improvements we can achieve in our business, particularly in legacy Heckmann Water Resources. We are focused on integrating our business and applying best practices across our national platform.

- *We have a strong financial profile*. We are generating Adjusted EBITDA that exceeds our capital expenditures, and have liquidity of over $190 million, which we believe will continue to grow in 2013.

- We have attractive opportunities to deploy capital at returns that we believe exceed our marginal cost of capital. We have in the past quarter significantly improved our capital allocation discipline, but believe the year will provide us with opportunities to invest at returns that we believe are accretive to our shareholders."

*Heckmann expects 2013 revenues to be between $750 and $825 million and Adjusted EBITDA to be between $200 and $220 million. The Company expects capital expenditures in 2013 to be between $90 and $110 million. The Company forecasts both revenues and Adjusted EBITDA to be back-half weighted, as 2013 activity ramps up from the 2012 slowdown and inclement weather impacted activity in the first several months of 2013*.

"*We are optimistic about 2013 and leveraging our platform,*" Mr. Johnsrud said. "*Our strategy is to provide full cycle environmental solutions to our customers, which includes delivery, collection, treatment, recycling and disposal solutions for restricted environmental products*. We have collectively worked and invested significantly to build a company with a national presence, including particularly strong logistics capabilities around delivery, collection and disposal. Our next step will be leveraging these investments by expanding environmental solutions around treatment and recycling, as well as solid waste disposal. *This strategy, which is*

43

*driven by our customers' needs, will provide us with a comprehensive, end-to-end environmental solution, which is a differentiating value proposition*."

84. Also on March 11, 2013, the Company conducted its earnings conference call to discuss its fourth quarter and full year 2012 results with analysts and investors. During the call, defendants made the following misleading statements:

[Defendant Heckmann:]

2012 was a record year in every respect. *We completed two transformational transactions, the TFI acquisition in April*, which is included in our last three quarters only, and the Power Fuels merger, which is included in the last month of the year.

\* \* \*

[Defendant Parkinson:]

We see 2013 as being back-half weighted. In some ways, it may look like a mirror of 2012. Activity is going to ramp up throughout the year.

Let me give you some anecdotal evidence here. A major customer of ours has announced in 2013 they intend, in a specific basin, on drilling 175 wells. They've said publicly 70 of those wells are going to be in the first half of the year, so 40% in the first half, and the remaining 105 are second half, or 60%. I would say that I think it's as consistent with our weighting in terms of how we think the pick-up is going to look like in 2013 for our results.

\* \* \*

[Defendant Parkinson:]

*Challenges of 2012 are subsiding*. The gas price is clearly still weak, albeit improving, and I would say that we are seeing some signs of encouragement in the Haynesville, which is a very good plus for our business. CapEx budgets in 2013 are being reset. That goes to the points we've talked about earlier; and *we believe there's some real tailwinds* from what our oil pricing is and what we're seeing from a macroeconomic front.

\* \* \*

[Defendant Heckmann:]

We have treatment capabilities in spades at TFI and in four locations in the shale business. We have substantial recycling capabilities at TFI and have begun several initiatives with major customers to recycle and reuse frac, flowback, and produced water for further fracking. *These initiatives are in the early stage, but we believe will quickly begin to bear fruit*.

\* \* \*

44

[Defendant Johnsrud:]

…*[T]he Eagle Ford and the Eagle Ford is just turning out to be a fantastic basin for everybody.* I think that, that's one that we are working on, making sure that we are positioned in the center of where our customers are at, so we're doing some more work to reposition ourselves. We're adding another facility in that basin. As we look at the Mississippi line, we're putting our toe into that one. We're not jumping in as fast as we can. We're doing what -- and we have two operations that we're -- or two facilities that we're operating, but that's a little bit of a unique basin, because some of the challenges are unique.

* * *

[Analyst:]

I know that you're at this CapEx inflection point but if I'm modeling in your -- the low end of your guidance, I'm still coming up with not much, if any, debt reduction from operations in 2013. Does your math jive with mine? If not, maybe you can elaborate?

[Defendant Parkinson:]

No, I don't think so, Scott. I think if you look at the midpoint on both of those. *I think in terms of where we see the revolver or the credit facility going, I think we see deleveraging there.* Obviously, we have a mix on how we look at some financing on some of the various assets coming on. I think the other thing I would comment is I think, we've talked a fair amount about the optionality we see on CapEx. So I don't know that, that's necessarily -- there's some fluctuation on that depending on where we come out in the band on the guidance. But when we do the math, and keep in mind the other function we have here and we talked about it is, we have the opportunity to offset some of the cash taxes as well which also improves the liquidity. So from our math, *there's deleveraging on the business going forward*.

[Analyst:]

All right. Maybe we can talk about that offline a little bit more specifically. The last question is about TFI. It's a terrific asset that you have there. There's synergies with both businesses. There are acquisitions out there for you. Kind of what's the plan for TFI in 2013? Are you looking at acquisitions as prominently there as you are in the other businesses?

[Defendant Johnsrud:]

I think that's a great question. Without question, *we really like the business [TFI], and what we're doing is, we are actively looking at what fits in our footprint.* You know, it's really interesting, Scott, if you kind of step back, all of the changes that are going on kind of in the Bakken and other places, by moving crude, it is really changing that business. And so the regional refining and some of the other pieces that are different in that industry are starting to really become a major impact. And we're trying to evaluate all of that, and make sure that we're strategically making the right decisions.

45

[Defendant Heckmann:]

Yeah, I would add to that, Scott, that at this point I think we're really glad we don't have a lot of fixed assets in that business, because as Mark rightly pointed out, with all this oil moving around this country now, I don't think anybody can see far enough ahead to see where you'd want to have a big capital equipment investment. **But *as recently as this morning, we were talking about acquisitions in that business [TFI]*.**

* * *

[Analyst:]

Okay, now on your internal controls and Jay, I get this is your -- you've taken over the realms as CFO, but *last year's EBITDA guidance was missed by about 30% all-in on the low end of the range. Has there been changes of how you look at assessing the guidance and giving out your guidance from what you did on the prior year or was last year an anomaly with that back-half fall apart that we had and the oil patch specifically?*

[Defendant Parkinson:]

*Yes,* and I'll comment at a little bit of a higher level on last year and a little more of a granular level about this year. Starting with last year, I think what we saw in the second half of the year and was talked about as early as the second quarter is you did see what I would call almost a fairly severe dislocation in the gas markets which actually had a double-edged effect. Not only did it affect activity in the gas markets but a lot of those assets moved to approximate oil-rich markets.

It's not very hard to move assets from Dallas area down to San Antonio so that's what you saw affect some of the mid-continent. It didn't affect the Bakken as well and then also, by and large in the second half of the year, we did see what we've talked about, just the general slowdown. I'd say as we think about it this year, we do have a very -- we've really expanded some of the internal capabilities and controls. We have a Director of Finance; we've hired a lot of people, so we're very focused on continuing to have a Company that matches the size we are today, the scale we are today. *We feel very good about where we are, from a control perspective*.

85.    Defendants, through participation in regularly scheduled Board meetings knew, or should have known, that the foregoing statements in the March 11, 2013 press release and conference call inaccurately portrayed the state of the Company's operations, that the "challenges of 2012" had subsided, that the Eagle Ford basin had been "fantastic" for the Company, that TFI was performing as expected, that there was basis to believe the Company could deleverage in the near future, and that the Company's internal controls over financial guidance were adequate.  In reality, the problems plaguing the Company

46

had not subsided, Eagle Ford had been experiencing serious operational problems since at least August 2012, the TFI business was not performing as projected, and as a result of these facts, there was no basis to believe the Company would be able to significantly deleverage in the near future. As detailed below, the Director Defendants knew the Company had been susceptible to inadequate internal controls over financial guidance in the recent past, and they knew or recklessly failed to know, that these problems had not been resolved, but had actually been magnified by the failure to address pre-existing problems at the acquired companies and Nuverra's failure to fully integrate these operations in Nuverra's financial accounting and financial reporting systems and processes.

86. On March 18, 2013, the Company filed its Form 10-K for the 2012 fiscal year with the SEC. Among other things, the Form 10-K stated:

> ***Rapidly Growing Market Segment with No Pure Environmental Solutions Competitor***. We believe that our energy end-markets present our Company with a highly unique growth opportunity. Many outside analysts are predicting significant growth in U.S. domestic oil and natural gas production, largely as a result of advances in drilling and completion techniques in the unconventional shale basins that we operate in. These new techniques require significant environmental solutions to deal with restricted waste products, and our customers are extremely focused on the responsible and safe handling of these products. As such, we believe that our strategy of providing a comprehensive environmental solution, from collection through disposal, provides us a strong competitive advantage. Many of our competitors offer only a component of this value chain, and offer environmental services as a small component of their overall business services. We believe our singular focus on surface-related environmental solutions allows us to provide our customers with a national, consistent, professional and highly focused value proposition that is highly differentiated from many of our competitors.
>
> ***Cash Flow Visibility with a Strong Customer Base***. We have a diversified business model that provides us with cash flow visibility. A portion of our revenue is derived from environmental product flows that comes from wells that have already been drilled, and we believe their ongoing production is a function of marginal costs of production. Our Industrial Recycling Solutions division further diversifies our cash flow profile and end-market concentration. We have a strong customer base that includes a majority of the largest global super major and major energy companies, as well as a number of large industrial customers.

87.    On March 21, 2013, the Company filed with the SEC an investor presentation discussing its 2013 guidance.   As described herein, the presentation inaccurately represented the Company's future prospects.  Slide 11 of the presentation was titled "Strong Forecasted Activity Growth in Our Core Basins," and stated that:

- Our Business is driven by total activity levels in the shale basins
    - o Reductions in pressure pumping pricing and dayrates for drilling rigs do NOT affect demand for our environmental solutions
    - o Oilfield service price reductions = well costs reductions that improve economics for our customers – positive for [Nuverra]
    - o Approximately 8-10% of upstream capex spend on environmental waste management – operators more focused on drilling/completion costs
- Increase in rig efficiency – more wells being drilled per rig per year
- Segmenting 2013 activity estimates by basin shows strong underlying growth in activity levels in our core basins
- Estimates on total horizontal footage drilled show strong growth building through 2013.

The slide also contained the following two charts:





88. The presentation also contained a slide titled "2013 Outlook," which offered the following guidance: (a) Revenues, $750-825 million; (b) Adjusted EBITDA, $200-220 million; and (c) Capex, $90-110 million:

89. On May 8, 2013, the Company issued a press release announcing its financial and operating results for the first quarter ending March 31, 2013. The Company reported that revenues for the first quarter of 2013 were $159.5 million, net loss was $12.6 million, and adjusted EBITDA was $32.1. The press release stated that weak results in the Industrial Solutions Segment, formerly the Recycling Division, including legacy TFI, were because the first quarter "is traditionally the slowest quarter," but that "revenue and collection volumes were in-line with budget." The press release further stated:

> Mark D. Johnsrud, Chief Executive Officer of Heckmann Corporation, said, "***We are very encouraged by the first quarter and are tracking well against our plan for the year***. Our revenue grew by over 40% sequentially and nearly tripled last year's first quarter revenues. Notwithstanding normal first quarter seasonal effects, the quarter was also affected by unusually harsh weather that resulted in 13 days of work being impacted in the Bakken Shale area, with additional days lost in Pennsylvania."

"*Our growth came from both the addition of our operations in the Bakken, as well as solid organic growth, primarily in the Marcellus and Eagle Ford Shale areas, as we began to see an increase in activities in these areas. Operations in the Bakken and Marcellus Shale areas began picking up in April. We are seeing many E&P operators beginning to seasonally increase activity with more pricing stability. We expect this activity trend to progress through the second half of the year, as we execute our plan of actively ramping up operations, including hiring additional drivers to meet customer demand*."

Jay C. Parkinson, Executive Vice President and Chief Financial Officer of Heckmann, commented, "As mentioned above, the first quarter was impacted by inclement weather. *We planned for this seasonality and continued to grow the business*. Adjusted EBITDA was $32.1 million for the quarter, which was in-line with our expectations. *We continue to leverage our national network to expand best-practices and improve our margin and return profile across the entire business. We are growing our business by driving efficiency*. During the quarter, our net cash capital expenditures were $14.7 million and we remain focused on the efficient deployment of capital. *We believe our ample liquidity will enable us to capitalize on acquisition opportunities as we continue to expand our treatment and recycling capabilities to broaden our full-cycle environmental solutions offering*."

\* \* \*

2013 Outlook & Financial Guidance

"*We are on track to meet our financial and operational objectives for 2013 and are seeing early signs of solid momentum*. We expect to see the greatest benefit of this increased activity in the second half of the year," said Mr. Johnsrud. "*As we continue to integrate our national platform, we are focused on increasing our operating margins. In addition to leveraging our relationships across basins and instituting best practice operations that yield cost savings, we are deepening our customer relationships by providing a solutions-based approach to our existing customers, with multiple product offerings*. We have also bolstered our team with the addition of two new regional managers in Texas, each with over 20 years of industry expertise, as well as a business development manager in the Eagle Ford Shale area. With a full suite of environmental service offerings in collection, storage, delivery, processing, recycling and treatment, we provide our customers with a critical single source logistics expertise. We believe we can leverage these strong capabilities beyond our current proficiencies at the production level to address the same needs at the drilling and completion phases of the E&P process."

*Heckmann reiterated its 2013 guidance of revenues between $750 and $825 million and adjusted EBITDA between $200 and $220 million. The Company expects capital expenditures in 2013 to be between $90 and $110 million. The Company forecasts both revenues and adjusted EBITDA to be back-half weighted, as 2013 activity ramps up from the 2012 slowdown and inclement weather impacted activity in the first several months of 2013*.

Integration Update

***The Company continues to integrate its various legacy businesses, including the implementation of best practices designed to drive margin and return profiles***. Management believes that significant opportunities exist to expand its solutions-based approach across multiple legacy HWR basins to expand margins. The Company also continues to expand its management team with key hires during the quarter including a Corporate Vice President of Human Resources and a Corporate Director of Risk Management. As mentioned above, Heckmann added two regional managers in Texas, as well as a business development manager in the Eagle Ford Shale area. In addition, the Company is bolstering its accounting and finance organization to align the organizational structure to meet the needs of the growing business.

90.     Also on May 8, 2013, the Company conducted an earnings conference call to discuss the first quarter results with analysts and investors.  During the call, defendants made the following misleading statements:

[Defendant Heckmann:]

We are in touch with the customers across the key shale basins offering our services and solutions in a unified and consistent manner daily which is unparalleled. And, ***we are now beginning to see the results. Our revenue and EBITDA growth have been every bit as rapid as we had hoped*** and managing the growth and expansion that will be required by our customers to remains the key to the future of our business, and I need to tell you that we all get that.

* * *

[Defendant Parkinson:]

I want to jump into some summary comments on the first quarter. ***The results, as Mark mentioned, are largely in line with our expectation***. The industry is really ramping up after a very slow second half of 2012, and ***we saw that activity start to pick up in the quarter***.

* * *

[Defendant Parkinson:]

On the balance sheet, we have $400 million of senior notes, $20.9 million of capital leases, and $147 million drawn on our $325 million facility, ***ample liquidity in the business. We think it's a very strong capital structure to allow us to continue to grow the business.***

* * *

[Analyst:]

…[J]ust a follow-up. A different question. Very quickly on the TFI side. Especially after some leadership changes with James Devlin leaving, can you give us an update over there? And, how that business fits with the shale business from now on?

[Defendant Johnsrud:]

What we're doing is we are making sure that we're not looking at necessarily running those businesses as an integrated platform. We have a lot of work that we can do where there is some commonality on customers, but ultimately the end customers are different in the E&P business versus the TFI customers. And so, what we're doing is *we're making sure that the guys at TFI -- that business are going to stay focused on what they are doing and doing well*. And, the same as in the E&P side. We want to make sure that we're keeping everybody focused on what they do well.

* * *

[Analyst:]

*Can you help us a little bit on how -- your comfort with your guidance?* What is it you are seeing in the upstream capital spending cycle or trends that give you that comfort? *Particularly given that lots of companies all around you that aren't in your business but in services to the industry keeping talking down activity. What are you seeing that gives you comfort about the upstream capital spending cycle ramping up?*

[Defendant Parkinson:]

Obviously, when we think just from a higher level, and we think about our total year guidance, it is really driven primarily by the discussions we have -- starting last year, frankly, with some of the larger customers in terms of what the activity outlook is going to look like. *And one of the things that was very obvious to us this year was that the ramp-up in activity was going to be sequential throughout 2013*. That was partly a function of weather in the first quarter, but it was also a function of people were just going to slowly ramp up activity. That is really what drives how we think about the business and *why we have comfort in what we are putting forward*.

* * *

[Analyst:]

…[H]ow would you think about what you could define as your run rate profitability exiting the quarter versus the actual results in the quarter? Doing 20.1% sort of the whole quarter -- how did you end the quarter?

[Defendant Parkinson:]

The quarter ended -- *I am not going to give anything specific on that, but I would say the quarter ended significantly stronger than the quarter began*. Just as the weather -- as we worked through the weather, number

53

one, but it wasn't totally the weather. It was also just as we expected, activity ramping up through the year. Like that presentation we put out where we showed the horizontal footage drilled pickups throughout the year. I think that is pretty consistent with how we think about it, and I think it's very consistent with what we saw intra-quarter in 1Q.

* * *

[Analyst:]

…[C]an you give us any additional commentary about any early success in places like the Tuscaloosa Marine, Mississippi Lime? And then, maybe progress on something a little more developed like the Eagle Ford?

[Defendant Johnsrud:]

We just see a lot of increase as far as activity and what they are asking us to do. And, it appears as far as a new growth area, that the Utica has some very interesting space in there that the results seem to be very promising. And then, also from a transportation standpoint, the oil is produced is right -- very transportation friendly to refineries.

As we look at the -- even we're starting to see some activity back in the Haynesville. We're visiting with customers that are talking about bringing some activity back. And then, there is also some spots in there that they're finding some real liquid -- it's a good liquid area. Some of the gas areas also have liquid in it. Then, I guess, the Eagle Ford, **we see that basin continuing to grow**. And, we are trying to grow our platform there to keep up with our customers' demands

* * *

[Analyst:]

I'm just trying to understand the pro forma sales and EBITDA by segment. For this quarter versus last year?

[Defendant Parkinson:]

**We are not releasing for this quarter the pro forma -- we're not releasing the segment information. If that's what you are asking**?

[Analyst:]

**How do you expect people to understand the earning power of the Company**?

[Defendant Parkinson:]

I think by the information we are releasing. If you are asking that -- **we are not releasing the Power Fuels versus the TFI.** We're just releasing it on a go-forward basis for the Company.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

[Analyst:]

*Okay. So we should discount everything, you told us in the Road Show from the prior numbers? I think you gave us pro forma '11 and '12 for the consolidated Companies correct?*

[Defendant Heckmann:]

*Yes*, I would close this conversation by saying *what we have released shows the picture of what the Company looks like today. We don't see any value at all in trying to go back and put together financials from companies that weren't together, had no synergies, weren't managed the same way, and in many cases were in different businesses*. We're not required to do it. We're not going to do it. And, *what we're doing is giving a picture of how the Company is operating going forward as a unified business*. So, that is what we're going to do. Next question.

* * *

[Analyst:]

I am hoping that you will at least give some type of a nod to this thinking. But, it would assume that your revenues started the quarter in the down 10% to down 20% territory and ended the quarter far less down than that. Is that a reasonable sketch of what happened?

[Defendant Parkinson:]

Are you talking about in the Company-wide or in the Haynesville?

[Analyst:]

I am talking about Company-wide because again you had a very difficult comparison in the Haynesville. Correct me if I'm wrong, but your volumes -- I'm sorry, your sales last year was 51% organically. And, a lot of that came out of the Haynesville. And, the Thermo Fluids number was actually higher than what I was expecting. When you sit here and do the math, you're coming up with -- my number at least is an organic of about minus 20%, which suggests that the first maybe two months were pretty difficult. And then, the third month was closer to a minus 5%. Is that a -- am I -- ?

[Defendant Parkinson:]

I agree the first month and frankly the first couple months of the quarter *primarily because of really some tough weather clearly impacted activity*. I think generally, the market activity was higher in the first quarter. I think pricing and utilization trying to adjust out the weather side were, as I said earlier, were stable. In some areas, they were up, and then, we saw activity continue to ramp up throughout the quarter.

[Analyst:]

Okay. The first thing you said, Jay, was that you saw activity higher in the quarter?

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

[Defendant Parkinson:]

*Yes. Activity -- I would say that broadly speaking, Scott, activity levels in the first quarter in terms of industry, if you try to adjust out for the weather, the activity was higher this quarter than it was last quarter*. Again, the weather has an impact on that though. And, it has had an impact [phenomenally] on our two strongest basins which are the Bakken and the Marcellus.

91.     The foregoing statements in the May 8, 2013 press release and conference call inaccurately portrayed the state of the Company's operations because, in reality: (a) activity was not materially improving; (b) the Company did not have ample liquidity; (c) Eagle Ford was not performing as stated; (d) TFI's results were weak primarily for reasons not related to seasonality; and (e) the financial data released by the Company did not provide an accurate picture of Nuverra's financial condition.   While defendants Heckmann, Johnsrud, and Parkinson professed the Company to be "on track to meet [the Company's] financial and operational objections for 2013" and that "early signs of solid momentum" were present, they disavowed guidance given to investors less than two months before.

92.     On May 16, 2013, the Company issued a press release announcing that proposed corporate name change, from Heckmann Corporation to Nuverra, had been approved by shareholders.

93.     On June 28, 2013, the Company announced that its Executive Vice President, Corporate Development and Chief Legal Officer, Damian C. Georgino, had notified the Company of his resignation effective July 8, 2013.

## THE TRUTH BEGINS TO EMERGE

94.     On July 30, 2013, the Company issued a press release announcing its "preliminary" results for the second quarter of 2013.  The press release announced that the Company expected to report revenues of $165.5 million and adjusted EBITDA of $32.8-33.6 million and stated in part:

The second quarter was impacted by the following factors:

- Activity levels in the Shale Solutions segment lagged the Company's internal forecast, **as *customers increased activity at a slower pace than originally anticipated*,** pushing revenue into the second half of 2013 and 2014.
- Unusually harsh weather conditions in the Bakken Shale area, the Company's largest region of operations, adversely impacted customer completion activity, as high levels of snow and rain hampered vehicle access to roads.
- ***Operational issues in the Eagle Ford Shale area, a key 2013 growth area for the Company, caused business operations to decline sequentially***. Nuverra has taken measures to remedy the situation by bringing in a ***new management team*** with significant industry experience and ***restructuring operations*** in the region.
- ***Stronger than anticipated customer demand in the Marcellus/Utica Shale area led to an increased utilization of subcontractors, resulting in lower overall margins***. To address the increased customer activity, Nuverra has been ***aggressively hiring drivers*** in the region to meet demand and ***reduce the use of subcontractors***. The Company also recently completed an acquisition in the Utica Shale area to expand operations and build on its existing presence in a basin that is very strategic to the Company's growth plans.

On this news, Nuverra stock plunged by nearly 13%, erasing more than $115 million in market capitalization in one day.

95. On August 8, 2013, the Company issued a press release announcing its results for the second quarter of 2013 and disclosing an adjusted EPS loss of $0.05 – nearly twice the loss of $0.03 that Nuverra had led the investment community to expect. The release stated in part:

Scottsdale, AZ — August 8, 2013 — Nuverra Environmental Solutions, Inc. (NYSE: NES) today announced financial results for the second quarter ended June 30, 2013.

- Revenues for the second quarter of 2013 were $165.5 million.
- Adjusted EBITDA was $33.3 million for the second quarter of 2013. The Company incurred adjustments to EBITDA in the second quarter of $9.9 million, which included non-recurring integration and corporate rebranding expenses of approximately $2.3 million, and a charge of $5.0 million related to the restructuring of business operations and cost

cutting initiatives in the legacy Heckmann Water Resources business.

- Net loss was $(12.8) million in the second quarter of 2013.

- The Company expects second half 2013 revenues to be between $350 and $400 million, second half 2013 adjusted EBITDA to be between $75 and $85 million and second half 2013 capital expenditures of $25 to $30 million.

Comments on the Second Quarter

Mark D. Johnsrud, Chief Executive Officer of Nuverra Environmental Solutions, stated, "*We made progress in the second quarter, as evidenced by the increase in revenues and improvement in adjusted EBITDA on a sequential basis. However, the financial results fell short of our expectations due to slower ramp up* by [exploration and production] operators across all shale areas; extraordinarily cold and wet weather conditions in the Bakken Shale area [the Company's largest base in operation]; *execution issues in the Eagle Ford Shale; hiring challenges in the Marcellus/Utica Shale areas*; and underperformance in our Industrial Solutions business.

96.     Also on August 8, 2013, the Company conducted an earnings conference call to discuss the second quarter results with analysts and investors.  During the call, defendants made the following misleading statements:

[Defendant Johnsrud:]

…[T]he second quarter results fell short of our expectations for four primary reasons. First, prolonged unseasonably harsh weather in North Dakota continued to delay well completion activity in the Bakken, which is our largest base in operation. This issue is not specific to Nuverra and has had similar impact on other competitors in the region. *We believe this revenue is delayed, not lost*, and I'll explain why in just a bit.

Second, *we anticipated a more aggressive ramp in the second quarter that did not occur* in our balance of our shale business. This is partially due to the decline in natural gas prices as well as a general lack of urgency among some of our E&P customers with regards to spending or increasing their spend during the quarter. *This particularly impacted results in the legacy Heckmann Water Resource business. Third, operational issues in the Marcellus/Utica, and Eagle Ford shale areas adversely impacted our results. And fourth, our Industrial Solutions business performed well below our expectations*. Nuverra's strength lies in the fact that we have built our business model with flexibility to respond quickly to changing market conditions. As such, when we saw the market in the second quarter wasn't ramping as quickly as we anticipated, we consciously decided to reduce CapEx to achieve our free cash flow goals and focus on cost reduction, asset utilization, and overall business efficiency.

* * *

[Defendant Johnsrud:]

We also saw some operators in the Marcellus increase the number of frack stages on horizontal wells. *We believe the increased well and stage count will help drive demand for our services in the second half of 2013*….

Looking at the Bakken specifically, margins in the region improved during the second quarter and we also experienced our fourth consecutive month

of revenue growth. *Although we did not realize as much revenue this quarter as we anticipated, we feel confident it will be deferred into the second half of the year and into '14*, because of the number of unfracked wells and the existing drilling rigs continue to be more efficient.

\* \* \*

[Defendant Johnsrud:]

Turning to the Marcellus/Utica area. We experienced stronger than anticipated customer demand during the second quarter, which resulted in the use of additional sub-contractors to meet the growth in business. The business here continues to be robust. We are aggressively recruiting and hiring staff needed to expand our operations and meet the increased demands of our services.

\* \* \*

[Defendant Johnsrud:]

Looking now at the Eagle Ford shale area. *Our business integration activities in Shale Solutions continues in earnest during the quarter as we implemented best practices across our operating platform. As a result of these efforts, we identified several operational challenges in the Eagle Ford and responded quickly to them.* The Eagle Ford was built organically and needed additional management with core industry experience. We brought in Don Justus to be our Vice President and General Manager for the Eagle Ford and Permian Basin operations. Don is a petroleum engineer with more than 30 years of experience in the oil and gas services industry, including a half a quarter of a century spent with Halliburton. He's leading our efforts to restructure the operation and to expand our Solutions offering so that we can better meet the customers' needs in the region.

\* \* \*

[Analyst:]

I just want to be clear, so I understand your guidance. It's an incremental $350 million to $400 million, so call it midpoint $375 million, and an incremental $80 million of EBITDA.

[Defendant Parkinson:]

That's correct. That would be our forecast for the -- so incremental to the first half of the year. That would be our forecast for the second half of the year, that's correct.

[Analyst:]

Right. So we've done $65 million, add another $80 million, so we're sort of in a $145 million way to think about the full year. What's it take -- because *that's a pretty healthy stepback*. What's it take on you all's part, or I guess a different way to word this is, as you exit the second half of the year, what do you think that run rate of your EBITDA is going into 2014? When you start factoring in a full year of effective landfill or the potential from a Halliburton joint venture? Or the annualizing of the savings pulled out of the Barnett or the Marcellus? So on and so forth.

[Defendant Parkinson:]

Part of that's the function -- to give you some context, I talked about, sequentially *we're taking a cautious outlook, really, for the second half of this year*. Sequentially if you think about 3Q over 2Q, I think you're mid to high single-digits growth rate. I think that's greater if you back into it. But what that looks like in Q4, I think it's greater in 4Q, not because of the industry. *It's not an assumption about a dramatic ramp-up in the industry in the fourth quarter*. You start to get the effect of the landfill coming online. I think they'll open this quarter. *I think we'll get to the full run-rate, you'll probably get a good chunk of that in the fourth quarter*.

*And then also we did some acquisitions, which we think will ramp up, as we get that integrated*. Specifically in the Utica, we have some opportunities up there as well. I think when you get into '14, we would probably take a more aggressive outlook in terms of where we think the business could go, in terms of a ramp-up. Probably above where you might exit the fourth quarter. Obviously tempering that with we think there's some, clearly some structural headwinds in the Industrial business and obviously that always tempers your outlook a little bit. I'd say that would be our general context of where we think the business is going.

\* \* \*

[Analyst:]

Help me understand a little bit, *one of the tenets of your disappointing EBITDA was that there was -- within the Eagle Ford, you had the management change and yet it seems as if you tried to do -- was it the Eagle Ford, I think you said, where you tried to do the best practices*? And then you found some things that were inefficiencies. I guess I don't really understand that. You tried to employ best practices somewhere and you found something. But was it more that the implementation of the best practices didn't exactly go as planned?

[Defendant Johnsrud:]

*It's really a combination of a couple things. One of them is, is that it seems like it's been a long time. But Jay and I have really only been in place here for two quarters*. You mentioned that. As we're going out, as we're diving and really getting deep into the details, and trying to be a lot more operationally focused and efficient, we started finding smaller issues. They seem small when you look at them, but in the magnitude they become very large and very expensive.

60

What we've started to look at is scheduling of people, all the way from how do we schedule our people day-to-day, week-to-week. And then we started finding some inefficient measures. And then we started looking at how could we improve those. And then we started looking at what we were doing for our customers, what we're getting paid, and then just overall utilization. And this is where we were able to determine we were having some inefficiencies, and then we made changes as necessary.

97. Although the statements in the August 8, 2013 disclosures above finally began to disclose the true nature of the problems at the Company, the Individual Defendants continued to downplay the scale of those problems, concealing what they knew or consciously disregarded: the magnitude of Company's debt concerns; that revenue was lost not delayed due to E&P companies developing their own service arms; the fact that the TFI and Power Fuels acquisitions were not performing as investors had been lead to expect; and that the Company was not capable of fully integrating these or the other acquisitions.

98. On August 23, 2013, financial analysts with *SeekingAlpha.com* published their investigation results in a research report entitled "Nuverra Environmental: A Sinking Ship With Default Risk." The article systematically debunked the Company's uniformly positive statements and detailed the facts regarding Nuverra's unserviceable debt load, the poor integration and lack of controls that has made it impossible for Nuverra to generate accurate forecasts:

This article will explain why investors in Nuverra Environmental Systems (NES) *could lose 80+% of their investment over the next 12 months*. The NES investor base is primarily retail investors, many of which blindly trusted Dick Heckmann and Jim Cramer, while 40mm shares (largely institutional investors) are short the stock. The key points:

1. Rollup gone wrong: NES is a destroyer of capital and has yet to put up any decent results. *The company has missed its guidance by 35+% in the last three years and yet to generate any positive operating profit*.

2. Misrepresenting itself: NES *claims to be an environmental service company, when in fact it is just a simple oilfield service company* (which trades at a meaningful discount to environmental service companies due to cyclicality and lack of differentiation). NES primarily owns trucks, tanks, and water disposal wells - nothing proprietary. The company is no different than the fluids service divisions of Key Energy, Basic Energy and Superior Energy.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

3. Founder jumped ship: Dick Heckmann saw the mess he created, handed off the reigns, removed his name from the company, and is distancing himself from this sinking ship.

4. Extremely overvalued: ***The company is extremely overvalued relative to its peers (9x EBTIDA vs. 5x EBITDA) and only has $0.08 of tangible book value per share***. Book value of $3.34 per share is extremely deceptive because it contains a massive amount of goodwill and intangibles from Dick's buying binge (where he overpaid for assets at the peak of the cycle).

5. Over-levered with liquidity crisis looming: NES has $551mm of debt, and borrowing capacity has already been restricted on its credit facility. The company has slashed spending in order to generate cash, but NES is still set to violate its credit facility covenants by year-end. This is using updated guidance, which has always proven overly optimistic (note item #1). The impending default event will ultimately lead to a restructuring where equity holders are left with nothing.

\* \* \*

## Heckmann Corp.'s History - The Reality

Nuverra, formerly known as Heckmann Corporation (HEK), is the brainchild of Dick Heckmann. HEK was started as a $500 million SPAC in 2007. For those unfamiliar, a SPAC is essentially a $500mm blank check for Dick to go buy something and create value. Why did people trust Dick enough to give him $500mm? The market was booming and Dick had experience in rolling things up and creating value. Keep in mind the 90s were a popular time for rollups, until many went bankrupt due to excessive leverage and poor results. We'll get back to Dick's "successful" track record in a bit. Dick struggled to find something to buy, but before the SPAC was going to dissolve, he purchased China Water and Drinks for $625mm. He thought an investment in China and water was an easy sell. Unfortunately, Dick didn't do his homework and, in 2010, announced that he purchased a complete fraud. Whups.

So Dick changed course. He saw the mania with shale development and the fracking controversy and started buying up water-related assets in popular plays, like the Haynesville. The new vision was to roll up small commoditized fluids service companies (that move fresh water to well sites, and remove dirty produced salt water). So that's what he did; he went around chasing the drilling hype and buying out private companies at the peak of the market (and paying a healthy premium - goodwill and intangibles are 95% of the equity).

HEK claimed to be a "water solutions company," when in reality it was a simple oilfield service company. Dick underestimated that the oilfield is a relationship business, and he had no experience in the industry. Things were going so wrong that in 2012 Dick purchased an oil recycling company in Arizona, which had nothing to do with the core business. With the word oil in it, though, HEK could now be a full environmental solutions company. All of the rolled up acquisitions were going so poorly that HEK was on track to violate its credit facility covenants. So what did Dick do? He made one last hail mary acquisition (Power Fuels), handed off the

reigns, and has stepped away before his mess blows up. Even Jim Cramer has distanced himself from the company.

## Dick Heckmann's Real Reputation

While most investors likely think that Dick Heckmann is a value creating genius that should be trusted with retirement money, they might want to temper their enthusiasm. Dick pioneered the roll-up strategy of creating "growth and value" through acquisitions. His previous company, US Filter, was a big success in the 90s as Dick rolled up water assets, completing over 150 acquisitions and growing sales from $17mm to $5b over the decade.

While the stock did great, and shareholders were rewarded, did Dick add real value? Let's look at the facts. US Filter was sold to an even larger rollup, Vivendi (VIVHY.PK), in 1999 for $7.9b. So what happened to Vivendi? It sold the US Filter water assets to Siemens (SI) in 2004 for just $993mm. Those assets remained a structural mess that never reached any desired margin targets. Dick's financial engineering had worked for his shareholders, but it appears he didn't create much real value at all.

## Disastrous Results

The numbers speak for themselves. NES has lost ~$7mm of operating profit so far in 1H13. In fact, NES has never generated positive operating profit (see below). And operating profit (EBIT) is before the millions of interest it must pay, which is growing as debt grows. The company has only generated positive EPS on a few rare occasions using some tax accounting magic.

\* \* \*

## Guidance Consistently Wrong

Most management teams tend to be conservative with their guidance. Not Nuverra. They have missed their guidance by over 35% for three years in a row; this is despite making a number of acquisitions to fill holes. 2011 missed by 46%, 2012 missed by 38%, and updated 2013 guidance is 32% lower than expectations from last quarter.

\* \* \*

## All Hail NES, the King of Adjustments

The only thing worse than missing guidance is the adjustments NES consistently makes to its financials to distort reality. "Adjusted" EBITDA is materially higher than real EBITDA and also includes a number of recurring expenses (stock-based comp, charges for relocating assets, etc.).

\* \* \*

## Power Fuels and Core Businesses in Decline

The Bakken has remained one of the most active basins in the country, yet Power Fuels results have collapsed. Why? Increased competition from new trucking companies entering the basin. Rental rates for tanks and other rental products have collapsed (excessive margins ultimately lead to

63

oversupply). And E&P companies are investing in their own gathering and disposal systems for water. This completely disintermediates Power Fuels, and it has already shown up in the numbers (and likely gets worse).

In addition to Power Fuels, Nuverra's core fluids service business will continue to decline (barring a major pickup in activity) as a result of heavy competition and disintermediation from E&P companies (drilling its own disposal wells and sourcing its own water). ***Investors need to be aware that NES's core fluids service business is the lowest margin and most commoditized division for most oilfield services companies (who also have an integrated solution for water)***. Other oilfield services (pressure pumping, coiled tubing, snubbing, drilling) are also commodity services, but much less so than trucking water and disposing it into disposal wells. The fluids service divisions of other oilfield service companies have been challenged this year due to oversupply from private and public players and disintermediation from E&P companies. Competition is expected to remain intense, and Nuverra will continue losing market share.

**Default Around the Corner**

What usually happens to over-levered rollups that don't deliver results? They blow up. ***NES has $400mm of senior notes and $130mm drawn on its $325mm credit facility. The credit facility has three covenants: minimum interest coverage ratio (2.75x), maximum total leverage ratio (4.00x), and maximum senior leverage ratio (2.50x).*** These can be found on page 39 of latest 10-Q. NES should have $195mm available on its credit facility, but borrowing capacity is already restricted to just $73mm because of its financial covenants (also p39). In fact, the only reason NES isn't already in default is because trailing results were so strong. That's the way it works with declining businesses, and why Dick bought Power Fuels – it bought him a year to escape!

\* \* \*

Investors should be even more concerned given the robust activity - what would happen to NES if drilling activity actually slowed down? New management is aware of the impending liquidity problems and is trying to ward off future lawsuits. The new Q is full of cautionary language (p39-40) when old Qs barely mentioned the covenants.

99. On September 9, 2013, Jim Cramer, host of Mad Money on CNBC, reversed his previously bullish position on Nuverra, calling it "a big disappointment."

100. These additional revelations concerning the Company's true business health and prospects caused Nuverra's market capitalization to plummet by another 18.7%, erasing an additional $132 million in market capitalization in a few days. In total, between July 29, 2013 and August 28, 2013, the Company's market capitalization dropped more than 35%, wiping out more than $323 million of value.

101. On October 17, 2013, the Company announced "Strategic Changes to Operating Structure." The press release stated in part:

> [T]he Company's Shale Solutions segment will now be overseen by three operating divisions:
>
> - The Northeast Division – comprising the Marcellus and Utica Shale areas;
> - The Southern Division – comprising the Haynesville, Barnett, Eagle Ford, Mississippian Shale areas and the Permian Basin; and
> - The Rocky Mountain Division – comprising the Bakken Shale area.
>
> Division leaders will manage all operational performance, growth activities, business development, and financial responsibility within the division, and each division head will report directly to Mark Johnsrud, Chief Executive Officer. In light of this leadership transition, by mutual agreement with the Company, Charles R. Gordon, President and Chief Operating Officer, will leave the Company and pursue an opportunity in an unrelated business. The COO position has been eliminated.
>
> * * *
>
> Commenting on the reorganization, Mr. Johnsrud stated, "We believe it is key in the current operating environment to be flexible, nimble and focused on emerging growth opportunities as we place renewed emphasis on streamlining our organization, as well as aligning our business development organization with a customer base that is increasingly national in scope. *These organizational changes provide us with better visibility and accountability within the operations in each shale basin and allow us to focus on enhancing best practices and reducing inefficiencies, where applicable. Additionally, this reorganization allows us to further extend the reach of our suite of environmentally compliant and sustainable solutions* to a national customer base that is demanding stricter environmental compliance standards. While we understand that change takes time, we believe these efforts will move the Company forward and set us on a strong path for future success."

102. Long before defendant Johnsrud issued the foregoing statements in the October 17, 2013 press release, the Individual Defendants knew or consciously disregarded the fact that the Company needed to impose standard controls and reporting processes such as those contemplated by the reorganization because the various companies Nuverra had acquired had yet to be fully integrated and continued to operate as independent entities making it impossible to achieve "better visibility and accountability."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

103. On November 7, 2013, the Company issued a press release announcing its financial results for the third quarter of 2013, and that it intended to effect a 1-for-10 reverse stock split during the fourth quarter. The Company reported revenue of $162.6 million, adjusted EBITDA of $25.1 million, and "[o]ne-time, non-recurring and non-cash charges totaling $233.1 million in the quarter including goodwill and long-lived asset impairment." The Company also announced that it had added a new director, R.D. Nelson. The press release also stated:

> Mark D. Johnsrud, Chief Executive Officer, commented, "During the third quarter, **we did not see the increase in industry activity that many had anticipated**. While our Shale Solutions segment revenue was relatively flat, we experienced a sequential decline in segment EBITDA due in part to increased costs in the Bakken that were incurred in preparation for more robust activity in 2014, as well as lingering challenges in the Eagle Ford as we manage competitive pressures and excess capacity in that market."
>
> * * *
>
> "**In early 2013, we spoke about the need to integrate our acquired companies, and we continue to focus on core growth areas. After careful analysis over several quarters, the Company's Board of Directors decided it was best to authorize a plan to divest the TFI business**. Accordingly, the Company has engaged an investment banking firm to initiate the sales process. **The Company currently expects to complete the divestiture late in the first quarter or early in the second quarter of 2014, and plans to apply all net proceeds toward the reduction of bank debt and general corporate purposes. Also, as a result of the goodwill impairment charge, the carrying value of TFI is approximately $145 million**."
>
> * * *
>
> Jay Parkinson, Chief Financial Officer, said, "On the Shale Solutions side, results were impacted by certain customer project rotations and delays in the Bakken in September, **although we believe this was a temporary event based on indications of October activity. We also experienced increased labor costs in the Bakken, in part as we plan to retain and incent personnel in anticipation of stronger demand into 2014**. Additionally, we continued to face challenges with our Industrial Solutions business, as used motor oil ("UMO") collection costs continued to impact results in the third quarter. We have taken significant steps to reduce UMO collection costs, and anticipate future benefit from these measures."
>
> …As of September 30, 2013, **cash and cash equivalents were $9.9 million, and total debt was $536.0 million, which included $400.0 million of senior unsecured notes, approximately $114.5 million drawn under the Company's amended credit facility and approximately $21.5 million of capital leases**. Additionally, as previously announced, during the third quarter **the Company amended its $325 million credit facility to increase**

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

*its permissible maximum total debt leverage ratio, which resulted in total liquidity of approximately $80 million as of September 30, 2013*.

\* \* \*

With this earnings report, in order to reflect the Company's focus on the long-term performance of the business, Nuverra is changing the method by which it provides guidance and business outlook. Going forward, the Company intends to provide qualitative perspectives and factors on the business and the overall market for its products and services.

\* \* \*

Nuverra *has recorded a non-cash charge of $98.5 million for the write-down of goodwill of TFI. The Company also recorded a non-cash charge of $108.4 million, relating in part to long-lived assets arising out of a number of acquisitions made by the legacy Heckmann Corporation in natural gas basins between 2009 and 2011*.

104.    Also on November 7, 2013, the Company conducted an earnings conference call to discuss the third quarter results with analysts and investors.  During the call, the following statements were made:

[Defendant Johnsrud:]

*…[W]e've engaged an investment bank to explore strategic alternatives for TFI, our industry solutions segment*. We expect to have the divestiture completed of this business by the late first quarter or early second quarter of 2014 and intend to use all the proceeds from the sale to pay down our bank debt and for general corporate purposes. This will significantly strengthen our balance sheet and give us additional flexibility to grow our Shale Solutions business.

I have concluded it is time for the Company to move forward and *put legacy issues behind us*.  As such, we've taken a number of one-time, non-cash, nonrecurring charges.

\* \* \*

[Defendant Johnsrud:]

Now turning to the operations, revenues in our Shale Solutions segment in the third quarter were essentially flat. Some customers in the Bakken unexpectedly rotated to projects in areas where we were not working for them. Based on October indications, *we believe this is transitory*.

We also had high personnel costs in the Bakken as we prepare for increased 2014 activities. In other basins, low natural gas prices and excess capacity persisted, impacting results.

*There were also lingering challenges in the Eagle Ford, where we are working to manage competitive pressures*. We've benefited from the expansion in the Utica Shale and recognize strong results from our treatments facility in the Marcellus-Utica.

67

\* \* \*

[Defendant Johnsrud:]

Even in some of the gas plays where drilling activity has essentially been stagnant over the last two years, **we are starting to see some increased activities**.

\* \* \*

[Defendant Parkinson:]

In the Shale Solutions segment, revenues were down slightly sequentially, as **the increase in the industry activity that we anticipated did not materialize**. We did have some specific events that also impacted our Shale Solutions segment, including **what we believe were some transitory events** that hit us in the month of September, in particular.

In the Bakken, one of our largest customers rotated some projects we were working on in September to another part of the basin we were not servicing them in, which impacted our September results in the area. **We do believe this was transitory**, based on indications of October activity in the Bakken. This impacted revenue in both logistics, as well as rental. The lower rental activity, of course, has a bigger impact on margins.

We also experienced higher personnel expense in the Bakken, relating in part to some incentive accruals we took during the quarter. **We continue to believe in an industry recovery in 2014, as Mark spoke about earlier, and do not want to have challenges meeting anticipated demand, so are making decisions for the long-term benefit of our Company**.

This negatively impacted Q3 margins in the basin, due to higher personnel costs, although **we are optimistic about activity picking up in 2014**. We are not seeing downward pressure on margins the Bakken from pricing.

Turning to some other shale basins. In the Eagle Ford, we continue to see challenges in this market.

Both revenue and EBITDA were down sequentially, **as we see ongoing competitive pressures due to capacity that has moved to the market from dry gas basins**. We continue to work on our turnaround plan in the area but believe we could see declines in this basin that could offset improvements in other basins in Q4.

\* \* \*

[Defendant Parkinson:]

**Looking to our current liquidity position, as previously disclosed, we proactively amended our revolving credit facility during the third quarter and our liquidity position as of September 30 was approximately $80 million.** Depending on our operating results in the fourth quarter, as well as the benefit of potential acquisitions we might make this quarter, we will be closely monitoring compliance with the minimum interest coverage ratio and maximum total leverage covenants at year-end.

We have proactively had discussions with our bank group on this and **may proactively seek a waiver of these covenants**. We believe, given where we are with the sale of TFI, which we currently anticipate will occur in the late first quarter or early second quarter of 2014, and the anticipation of a complete paydown of our revolving credit facility as a result, we will be in a position to have a proactive discussion with our bank group.

\* \* \*

[Defendant Parkinson:]

**I'd also say early signs in October are that [a slow September] was transitory. We're seeing activities pick back up**.

\* \* \*

[Analyst:]

Okay and then just remind us of the most sensitive bank debt covenant that we are worrying about going into fourth quarter?

[Defendant Parkinson:]

**It will probably be the EBITDA-to-interest coverage ratio**. We amended the total debt-to-EBITDA ratio, which governs liquidity, so the one that we'll be monitoring will be the end EBITDA interest coverage ratio.

A couple of things to keep in mind about that would be, we could do something to the facility all together before TFI. We've looked at an ABL facility, which would have no covenants at all. And also it would permit us to do some of the things that we talked about earlier in terms of buybacks.

But **we may look to waive that**. We have had very proactive discussions with our bank group already.

\* \* \*

[Defendant Parkinson:]

**We're seeing by and large, pricing has stabilized maybe with the possible exception of pockets of weakness, particularly in the Eagle Ford**. One thing -- is a lot the capacity from the dry gas basins has gone down there.

One thing that **we are I would say cautiously optimistic about as we are working on our turnaround in the Eagle Ford is there is very robust projections for growth in the Permian next year and that might take some of that capacity out of the Eagle Ford**, particularly the southern Eagle Ford and, so we think that will help that basin. I'd say, the Bakken, we're seeing very stable pricing, the Utica very stable pricing, Marcellus very stable. The Haynesville, obviously pricing is lower than where we would like it to be but I would say that we're seeing stability by and large down there as well.

105.    In the Company's November 7, 2013 press release and earnings conference call, investors learned for the first time what the Individual Defendants knew or

69

consciously disregarded, that the Company was simply not experiencing the growth Individual Defendants had predicted, and that challenges caused by the Company's failure to integrate acquired businesses were ongoing and severe enough to warrant exiting such "legacy" businesses because the various companies Nuverra had acquired had yet to be fully integrated and continued to operate as independent entities.

106. On November 8, 2013, an article was published on *The Motley Fool* titled "Inside Nuverra's Quarter: The Good, the Bad and the Ugly." The article reported in part:

> The biggest problem on the quarter is that Nuverra did not see the increase in industry activity that it has been anticipating all year. This caused its shale solutions revenue to be relatively flat while earnings declined. The company was hurt by higher labor costs as it spent more to retain and incentivize personnel in anticipation of a stronger 2014.
>
> ***What makes matters worse is that one of its competitors in the fluids management segment, Key Energy Services (NYSE: KEG ) actually saw its fluids management profits improve***. This was despite lower revenue and sustained competitive pressures because it was able to reduce costs and improve its operations. The same can be said for Basic Energy Services (NYSE: BAS) which saw a slight uptick in revenue and roughly flat profits from its fluid services segment. While neither company is seeing a robust operating environment, both appear to be managing the current conditions much better than Nuverra.
>
> \* \* \*
>
> As bad as Nuverra performed operationally on the quarter, things did get worse. The company announced that it's taking a one-time, non-cash charge of $233.1 million on the quarter that includes goodwill and long-lived asset impairment. ***While this is a non-cash charge today, it did represent large cash outlays in the past***.
>
> One of the assets being written down is the TFI business it bought last year for $245 million. ***Turns out that the business wasn't the strategic fit that Nuverra thought and it has now decided to sell the business and use the proceeds to pay down debt and possibly buy back some stock. The total obliteration of investor capital here, which is $98.5 million of the writedown, is an ugly end to a business that has never lived up to the stable source of earnings that it was supposed to generate***.

107. On November 25, 2013, the Company announced the reverse stock split would take effect on December 3, 2013.

108. On December 2, 2013, Moody's Investors Service placed Nuverra Environmental Solutions' B2 corporate family and B2-PD probability of default ratings

on review for downgrade. The reasons given for the review for downgrade included: "Since the acquisition of Power Fuels in November 2012, both the legacy and acquired businesses have experienced low utilization of the extensive fleet of trucks and water tanks."

**REASONS THE STATEMENTS WERE MISLEADING**

109. Throughout the relevant period, the defendants knew, consciously disregarded, or were reckless in not knowing that the public statements concealed the true state of its business by attributing weak results to external factors when, in reality, the weak results were due to operational problems and unrealistic projections that defendants knew the Company could not and would not achieve.

110. The defendants also knew, consciously disregarded, or were reckless in not knowing that the Company's acquisitions to purportedly broaden the services it offered would not, and did not, sufficiently address the negative trends, including the Company's lack of organic growth, increased competition from trucking and exploration and production companies, and falling product rental rates. The reckless acquisition strategies defendant Heckmann pursued and the Board approved saddled the Company with unmanageable debt and marginal assets.

111. Similarly, the defendants knew, consciously disregarded, or were reckless in not knowing that, contrary to their public statements, the Company's liquidity position was not strong and its capital expenditures would continue to outpace its revenues. Indeed, as recently announced, Nuverra amended its credit facilities to increase its maximum total debt leverage ratio to ensure continued liquidity and the ability to aggressively pursue its acquisition strategy.

112. Finally, the Director Defendants knew, consciously disregarded, or were reckless in not knowing that Nuverra's business was not growing to the extent defendants represented and the financial guidance provided by the Company was inaccurate and misleading.

## DAMAGES TO THE COMPANY

113. Nuverra has been, and will continue to be, severely damaged and injured by the defendants' misconduct and misleading statements. As a direct and proximate result of their conduct, Nuverra credibility, corporate image, and goodwill, have been seriously harmed as reflected by the Company's $323 million, or more than 35% market capitalization loss.

114. Nuverra's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Nuverra's current and potential customers consider a company's ability to perform on contracts. Businesses are less likely to award contracts to companies that have problems providing quality service. Nuverra's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the defendants have materially increased the perceived risks of investing in and lending money to the Company. Bloomberg reports an increase in the Company's Weighted Average Cost of Capital ("WACC") of 200 basis points since Q2 2013, which illustrates the Company's worsening financial position.

115. Further, as a direct and proximate result of the defendants' actions, Nuverra has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Nuverra and certain officers and directors in the Securities Actions;

(b) costs incurred from paying any potential settlement or adverse judgment in the Securities Actions;

(c) costs incurred from investigating and remedying the Company's internal control deficiencies; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Nuverra.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

116.    Plaintiffs bring this action derivatively in the right and for the benefit of Nuverra to redress injuries suffered, and to be suffered, by Nuverra as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Director Defendants.  Nuverra is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiffs will adequately and fairly represent the interests of Nuverra in enforcing and prosecuting its rights.

118.    Plaintiffs have continuously been shareholders of Nuverra at times relevant to the wrongdoing complained of and are current Nuverra shareholders.

119.    At the time the original complaint was filed, Nuverra's Board of Directors consisted of the following nine individuals: Johnsrud, Heckmann, Simonds, Seidel, Spence, Osborne, Quayle, Holtz, and Barkett, previously defined as the "Director Defendants."  Plaintiffs have not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.[4]

**Pre-Suit Demand Is Excused Because a Majority of the Current Board Members Face a Substantial Risk of Liability for Their Own Misconduct**

**Defendant Heckmann**

120.    Defendant Heckmann, the Company's founder, the CEO and Chairman until November 2012, and current Executive Chairman, has now presided over two separate aggressive acquisition strategies detrimental to the Company.  Until recently, defendant Heckmann ran the daily operations of the Company, and was directly involved in identifying acquisition targets, both China Water initially and, more recently, TFI,

---

[4] On November 6, 2013, Nuverra expanded its Board to 10-seats and appointed non-defendant R.D. "Dan" Nelson to fill that seat.  Even if he were included in the demand futility analysis a majority of the board would still face liability and lack independence.

Power Fuels, and other companies involved in servicing oil and gas exploration and production operators, and conducting the due diligence for such acquisitions. Defendant Heckmann has extensive experience with business acquisitions and corporate finance through his past leadership of K2, Inc. and U.S. Filter where he completed over 20 and 150 successful acquisitions, respectively, during his tenure with those companies.

121. Defendant Heckmann is charged with providing the Board with a unique perspective on operational matters and issues involved in the Company's business and strategy. Defendant Heckmann also brings to the Board knowledge of the day-to-day operations of the Company, which provides valuable insight to the Board as it reviews the Company's strategic and financial plans, as well as corporate governance practices generally and potential issues facing companies like Nuverra. The Company's various divisions prepared monthly and quarterly forecasts and revenue reports, P&L reports, and equipment utilization reports that were presented to COO Gordon and then rolled up for presentation to defendant Heckmann during his tenure as CEO, and ultimately provided to the Board.

122. Before recommending that the Company proceed with the acquisition of TFI, *inter alia* the other oilfield services companies, defendant Heckmann had a duty to inform himself of all reasonably available material facts, including whether the Company's due diligence into those companies was effective and whether the combined company would meet the promised growth projections. Defendant Heckmann personally participated in the due diligence process for the merger acquisition with Power Fuels, touring Nuverra operations with defendant Johnsrud.

123. Defendant Heckmann also had a duty to accurately report this information to the Board. Despite these duties, defendant Heckmann failed to report realistic projections of the Company's future growth and financial prospects. Instead, defendant Heckmann mislead shareholders, claiming the TFI acquisition would deliver "predictable revenue" and growth, and that integration has been smooth. Defendant Heckmann faces a substantial likelihood of liability for breaching his fiduciary duties in connection with

his misleading statements as to the Company's fundamental operations problems and future prospects.

124. Defendant Heckmann knew or, but for the exercise of reasonable diligence, would have known that the Company's efforts to integrate the acquired oil services businesses was stymied by deficient internal processes and controls. Indeed, defendant Heckmann knew through his direct participation in at least one on-site meeting in mid-2012, that the Company's deficient internal processes had resulted in an $800,000 miss in labor costs for which there were no revenues to offset. Given his involvement in monitoring the resolution of this accounts receivable balance, defendant Heckmann knew, or should have known, of the discovery of approximately $1.5 million in improperly posted revenue due to duplicated billings.

125. According to the Company's most recent proxy statement, defendant Heckmann is primarily employed as the Executive Chairman of the Company and is subject to an employment agreement in that capacity. Defendant Heckmann has presided over deficient internal controls over disclosure since the very inception of the Company and breached his fiduciary duties by making misleading statements about the Company's prospects. Under defendant Heckmann's watch, since its inception, the Company has consistently drastically overstated its guidance and has failed to achieve its annually forecasted revenue and/or EBITDA for a majority of its existence (2008, 2011, 2012, and 2013). At relevant times during 2012 and 2013, defendant Heckmann was aware of, and in many instances was responsible for, the Company's false statements and misleading guidance detailed herein. Defendant Heckmann also signed the Company's March 18, 2013 Form 10-K, which included misleading statements regarding the Company business prospects and failed to disclose known adverse trends affecting the Company's operations. He took no action to correct these statements or to institute functioning controls that would provide investors with a true picture of the Company's business.

126. Due to defendant Heckmann's complicity in the wrongdoing alleged herein, failure to institute functioning controls in the face of obvious risks, and status as an

employee and founder, he is unable to disinterestedly and independently consider a demand for litigation.  As result, demand on defendant Heckmann is futile.

**The Audit Committee Defendants**

127.  Defendants Osborne, Spence, and Barkett are the members of Nuverra's Audit Committee (the "Audit Committee Defendants").  The Audit Committee, according to the Company's public filings, is responsible for oversight relating to: (a) the integrity of the Company's financial statements; and (b) the Corporation's compliance with legal and regulatory requirements.

128.  Defendant Osborne, as a founder and Chair of the Audit Committee, knew that the Company's experience with acquisition China Water – a roll-up company purchased with shareholder capital without adequate due diligence and known material and unresolved internal controls problems – created a need for direct hands-on Board oversight of due diligence, assessment of fit, integration post-close and implementation of adequate internal controls over accounting and finances.  Indeed, the Audit Committee Defendants knew that due diligence headed by defendant Heckmann had previously left uncovered, among other things, a massive fraud at China Water and that the Board had recklessly disregarded the auditor's findings that China Water had intentionally failed to pay the correct amount of value added tax ("VAT") on its reported revenue figures to the Chinese government.

129.  Given this experience, the Audit Committee Defendants were on actual notice that the Company was susceptible to deficient internal controls and corporate governance, particularly in connection with disclosures related to financial guidance and the performance of acquisitions.  Yet, despite this knowledge, the Audit Committee Defendants, including defendant Osborne, failed to require the Company to present detailed information and reports to substantiate the claims that the acquisitions, including TFI and Power Fuels, would deliver the value promised or to investigate whether external causes were truly the cause of missed financial projections.  Moreover, as detailed herein, at the same time that the Company was purportedly enhancing its governance and

disclosure controls, the Audit Committee was approving the Company's repeated issuance of misleading statements that failed to disclose significant negative trends affecting Nuverra, which demonstrates a lack of good faith and establishes that they face a substantial likelihood of liability.

130. The Audit Committee Defendants (Osborne, Spence, and Barkett), have now presided over multiple successive annual guidance misses that are routinely inaccurate by 30% or more. Yet these defendants, all three of whom have served on the Audit Committee since at least December 2010, have failed to take any corrective action to ensure that the Company's publicly issued guidance is more reliable. Although defendants Spence and Barkett had not yet joined the Board when it agreed to the disastrous China Water deal in 2008, they joined shortly thereafter and witnessed first-hand the harm that resulted to the Company has a result of that breakdown in corporate governance and truthful disclosure: derivative litigation related to disclosure and controls problems continued until at least mid-2013 and the securities class action survived a motion to dismiss and is in full-blown discovery.

131. At all relevant times during 2012 and 2013, defendants Spence, Osborne, and Barkett knew or but for the exercise of reasonable diligence should have known that Nuverra was making misleading and inaccurate statements regarding, among other things: (a) expanding its workforce; (b) its business prospects; and (c) its financial results.

132. These three defendants breached their fiduciary duties as Board members and as Audit Committee members by declining to halt these untrue and misleading statements. Defendants Spence, Osborne, and Barkett also signed the Company's March 18, 2013 Form 10-K, which included misleading statements regarding the Company's business prospects and failed to disclose known adverse trends affecting the Company's operations. They took no action to correct these statements or to institute functioning controls that would provide investors with a true picture of the Company's business. Due to the Audit Committee Defendants' breach of their duties, any demand upon them is futile.

**The Governance Committee Defendants**

133. Defendants Quayle, Osborne, and Holtz are members of Nuverra's Nominating and Corporate Governance Committee ("Governance Committee Defendants"). They are also co-founders of the Company and were defendants in derivative litigation stemming for the botched China Water acquisition were on actual notice that the Company was susceptible to deficient internal controls and corporate governance, particularly in connection with disclosures related to financial guidance related to and the performance of acquisitions.

134. According to the 2013 Proxy, the Governance Committee is responsible for "reviewing [Nuverra's] corporate governance principles and providing recommendations to the Board regarding possible changes; and overseeing, discussing with [the] Board and management, and, as necessary, making recommendations to the Board regarding how to address, risks relating to … ethics, corporate governance and business practices." Defendants Quayle, Osborne, and Holtz breached their fiduciary duties by declining to put in place stringent measures to address the business practices that lead to the issuance of untrue and misleading statements.

135. At relevant times during 2012 and 2013, defendants Quayle, Osborne, and Holtz knew or but for the exercise of reasonable diligence should have known that Nuverra was making misleading and inaccurate statements regarding, among other things: (a) expanding its workforce; (b) its business prospects; and (c) its financial results. These three defendants breached their fiduciary duties as Board members and as Governance Committee members by declining to halt these untrue and misleading statements. Defendants Quayle, Osborne, and Holtz also signed the Company's March 18, 2013 Form 10-K, which included misleading statements regarding the Company's business prospects and failed to disclose known adverse trends affecting the Company's operations. They took no action to correct these statements or to institute functioning controls that would provide investors with a true picture of the Company's business. Due

to the Governance Committee Defendants' breach of their duties, any demand upon them is futile.

**All Director Defendants, Including Defendants Seidel, Simonds, and Johnsrud**

136. Defendant Heckmann's experience in acquiring China Water – a roll-up company purchased with shareholder capital without adequate due diligence and known material and unresolved internal controls problems – created a need for direct hands-on Board oversight of due diligence, assessment of fit, integration post-close and implementation of adequate internal controls over accounting and finances. Given this experience, all of the Director Defendants were on actual notice that the Company was susceptible to deficient internal controls and corporate governance, particularly in connection with disclosures related to financial guidance related to and the performance of acquisitions. Indeed, as a material result of the China Water Derivative Action, the Company purportedly began adopting various enhanced corporate governance measures in 2010, and agreed to implement additional governance measures to strengthen internal controls and corporate governance as recently as April 2013. For example, as part of the China Water settlement, the Company agreed to create a Disclosure Committee to oversee production of information required to be disclosed on a timely basis by the Company in its SEC filings and press releases.

137. Defendant Seidel was a defendant in the China Water Derivative Litigation and witnessed first-hand the harm inflicted on the Company due to its deficient internal controls and processes and a hastily conducted acquisition where due diligence was insufficient. Further, defendant Seidel, as a CEO of another company in the water-related industry, was well-equipped to review and question the Company's management on the facts and assumptions underlying the acquisition strategy being undertaken and guidance being provided to investors in 2012 and 2013. Defendant Seidel knew or but for the exercise of reasonable diligence should have known that the statements as to the Company's financial performance and growth prospects were inaccurate and misleading. Defendant Seidel also signed the Company's March 18, 2013 Form 10-K, which included

misleading statements regarding the Company's business prospects and failed to disclose known adverse trends affecting the Company's operations. Due to defendant Seidel's breach of his duties, any demand upon him is futile.

138. Defendant Simonds, the Company's Vice Chair of the Board, was a director during the China Water Derivative Litigation and witnessed the fall-out from the harm inflicted on the Company due to its deficient internal controls and processes, which put him on actual notice. Defendant Simonds signed the Company's March 18, 2013 Form 10-K, which included misleading statements regarding the Company's business prospects and failed to disclose known adverse trends affecting the Company's operations. Due to defendant Simonds' breach of his duties, any demand upon him is futile.

139. Defendant Johnsrud is CEO of Nuverra and owns approximately 38% of the shares outstanding. Since becoming CEO in November 2012, defendant Johnsrud has permitted the Company to issue, and himself issued, numerous statements that he knew or but for the exercise of reasonable diligence would have known were inaccurate and misleading and failed to take any action to rectify them or to hold those responsible to account. Defendant Johnsrud also signed the Company's March 18, 2013 Form 10-K, which included misleading statements regarding the Company's business prospects and failed to disclose known adverse trends affecting the Company's operations. Defendant Johnsrud is named as a defendant in the Securities Action, where he is alleged to have violated sections 10(b) and 20(a) of the Exchange Act by making improper statements in connection with the Company's financial results. Due to defendant Johnsrud's breach of his duties, any demand upon him is futile.

140. As detailed above, at the same time that the Company was purportedly enhancing its governance and disclosure controls, the Director Defendants were presiding over the Company's repeated issuance of misleading statements that failed to disclose significant negative trends affecting Nuverra, which demonstrates a lack of good faith

and establishes that he faces a substantial likelihood of liability. Due to the Director Defendants' breach of their duties, any demand upon them is futile.

141. As a result of the Director Defendants' conduct, the Company is now the subject of securities class action lawsuits. Any demand on the Nuverra Board is futile for this reason as well.

**Demand Is Excused Because a Majority of the Board Lacks Independence**

142. In addition to defendants Johnsrud and Heckmann who are hopelessly conflicted through their key roles at the Company (Johnsrud, CEO and 38% shareholder; and Heckmann, founder and Executive Chairman), defendants Holtz, Osborne, Quayle, Spence, and Seidel are incapable of objectively considering a pre-suit demand against each other because of longstanding history of business relationships amongst and between each other.

143. In 1990, defendant Heckmann acquired US Filter, a commercial and consumer water and wastewater treatment company. Defendant Heckmann brought defendant Spence to US Filter in December 1991 as a Vice President, and in January 1992 defendant Spence became US Filter's Chief Financial Officer. Defendant Seidel joined US Filter in 1991, holding various positions before eventually rising to the offices of President and Chief Operating Officer of the Water & Wastewater Group, and later serving as CEO after defendant Heckmann's departure. Defendants Heckmann, Spence, and Seidel served concurrently as executives of US Filter for more than seven years. Defendant Osborne joined the US Filter board shortly after defendant Heckmann's takeover. Defendant Quayle subsequently joined the board in February 1996. US Filter was one of the heaviest contributors to defendant Quayle's political campaign and fundraising efforts from approximately 1989 to 1992. Defendant Holtz served as a motivational speaker at US Filter.

144. In addition, from October 2002 through February 2007, defendant Heckmann was CEO of K2 Inc. ("K2"), a premier consumer products company. While at K2, defendant Heckmann recruited for the K2 board many of the same directors who had

served with him during his time at US Filter, including defendants Holtz, Osborne, and Quayle.

145. Further, there are three conflicted insiders who founded the Company and made millions of dollars of the Company's IPO. These defendants are: Holtz, Quayle, and Osborne. Prior to the IPO, these three defendants, along with defendant Heckmann, contributed a small amount of seed money to the Company in exchange for nearly 20% of the Company's total securities, worth more than $100 million in the IPO. Thus, since the Company's very inception, defendants Quayle, Osborne, and Holtz have known that the excessively optimistic guidance and false public statements would seriously harm the Company and that the Company's controls against such statements had not functioned properly in the past, yet they acquiesced in a similar course of conduct just a few years later. Due to the foregoing, defendants Quayle, Osborne, and Holtz are incapable of disinterestedly and independently considering a demand on the board because they are loyal to defendant Heckmann and their financial interests lie with defendant Heckmann, and as founders of the Company, they are insiders whose professional reputations and personal relationships render them hopelessly conflicted

146. Any action by defendants Heckmann, Holtz, Osborne, Quayle, Spence, and Seidel to prosecute the claims alleged herein would threaten their business relationships. Accordingly, demand on defendants Heckmann, Holtz, Osborne, Quayle, Spence, and Seidel is futile.

147. The acts complained of herein have resulted in substantial economic benefits to the Director Defendants without corresponding recognition of, or accounting for, the correlated liability and risk that Nuverra was subject to as a result of its lack of internal controls. The Director Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation. Thus, demand on the Director Defendants is futile, and therefore, excused.

148.    Plaintiffs have not made any demand on the other shareholders of Nuverra to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Nuverra is a publicly held company with over 259.9 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Breach of Fiduciary Duty

149.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

150.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nuverra's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

151.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Nuverra.

152.    In breach of their fiduciary duties owed to Nuverra, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

153.    In particular, defendants Heckmann, Johnsrud, and Parkinson, as Officer Defendants, knowingly, recklessly, or with gross negligence: (i) made or authorized misleading statements in the Company's conference calls, press releases, and public

filings concerning the Company's business prospects; and/or (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.

154. The Director Defendants, Heckmann, Johnsrud, Simonds, Osborne, Barkett, Spence, Holtz, Quayle, and Seidel, as directors of the Company, owed Nuverra the highest duty of loyalty. The Director Defendants knowingly or recklessly breached their duty of loyalty by signing the Company's March 18, 2013 Form 10-K, which they knew or were reckless in not knowing was misleading, and by failing to ensure that reliable systems of reporting were in place at the Company.

155. The Audit Committee Defendants – Barkett, Osborne, and Spence – breached their fiduciary duty of loyalty by approving the statements and financial guidance described herein that were made during their tenure on the Audit Committee, which they knew or but for exercise of reasonable diligence would have known were misleading. The Audit Committee Defendants completely and utterly failed in their duty of oversight and in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

156. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Nuverra has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation brought against the Company, and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Waste of Corporate Assets

157. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

158. As a result of the misconduct described above, the defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Actions, which they brought on with their misleading statements. In

addition, the defendants have caused Nuverra to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

159.    Defendants have further wasted corporate assets by causing the Company to purchase TFI at for approximately $245 million and, approximately eighteen months later, determining to write down the TFI business and assets by $233 million.

160.    As a result of the waste of corporate assets, the defendants are liable to the Company.

161.    Plaintiffs, on behalf of Nuverra, have no adequate remedy at law.

## COUNT III

## Unjust Enrichment

162.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

163.    By their wrongful acts and omissions, the defendants were unjustly enriched at the expense of and to the detriment of Nuverra.  The defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Nuverra.

164.    Plaintiffs, as shareholders and representatives of Nuverra, seeks restitution from the defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the defendants, and each of them, from their wrongful conduct and fiduciary breaches.

165.    Plaintiffs, on behalf of Nuverra, have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, plaintiffs demand judgment on behalf of Nuverra as follows:

A.    Declaring that plaintiffs may maintain this action on behalf of Nuverra and that plaintiffs are adequate representative of the Company;

B.     Against all defendants, jointly and severally and in favor of Nuverra for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment, including interest thereon;

C.     Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nuverra;

D.     Directing the defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nuverra and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Company's disclosure and financial controls;

2.     a proposal to strengthen Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.     a provision to permit the shareholders of Nuverra to nominate at least three candidates for election to the Board; and

4.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Determining and awarding to Nuverra exemplary damages, including disgorgement of all profits, benefits, and other compensation obtained by defendants, in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Nuverra restitution from defendants, and each of them;

1        G.    Awarding plaintiffs the costs and disbursements of this action, including

2    reasonable attorneys' and experts' fees, costs, and expenses; and

3        H.    Granting such other and further equitable relief as this Court may deem just

4    and proper.

5    **JURY DEMAND**

6        Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury.

7    Dated: December 31, 2013         ROBBINS ARROYO LLP

8

9                                         */s/ Craig W. Smith*

                                      Brian J. Robbins

10                                         Craig W. Smith

                                      Jenny L. Dixon

11                                         600 B Street, Suite 1900

                                      San Diego, CA  92101

12                                         Telephone: (619) 525-3990

                                      Facsimile: (619) 525-3991

13                                         brobbins@robbinsarroyo.com

14                                         csmith@robbinsarroyo.com

                                      jdixon@robbinsarroyo.com

15

16                                         HARWOOD FEFFER LLP

17                                         Robert I. Harwood

                                      Matthew M. Houston

18                                         Benjamin I. Sachs-Michaels

                                      488 Madison Avenue, 8th Floor

19                                         New York, NY 10022

20                                         Telephone: (212) 935-7400

                                      rharwood@hfesq.com

21                                         mhouston@hfesq.com

22                                         bsachsmichaels@hfesq.com

23                                         *Plaintiffs' Co-Lead Counsel*

24

25

26

27

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Hart L. Robinovitch, Esq.
ZIMMERMAN REED
14646 North Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6400

Patricia A. Bloodgood, Esq.
ZIMMERMAN REED PLLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400

Michael C. McKay, Esq.
SCHNEIDER WALLACE COTTRELL
KONECKY LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0141
Facsimile: (866) 505-8036

Peter Safirstein, Esq.
MORGAN & MORGAN, P.C.
28 West 44th Street, Suite 2001
New York, NY  10036
Telephone: (212) 564-1637
Facsimile: (212) 564-1807

*Additional Counsel for Plaintiffs*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

**NUVERRA ENVIRONMENTAL SOLUTIONS, INC. VERIFICATION**

I, Matthew D. Kennedy, hereby verify that I am familiar with the allegations in the Consolidated Complaint, and that I have authorized the filing of the Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 12/23/13

_____
Matthew D. Kennedy

## NUVERRA ENVIRONMENTAL SOLUTIONS, INC. VERIFICATION

I, Mark Mutton, hereby verify that I am familiar with the allegations in the Consolidated Complaint, and that I have authorized the filing of the Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 12/27/13

Mark Mutton

## VERIFICATION

I, George Partilla, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Consolidated Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the consolidated complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _Dec 27, 2013_

_George Partilla_
GEORGE PARTILLA

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that on December 31, 2013, I electronically transmitted the

3 attached document to the Clerk's Office using the EM/ECF System for filing and

4 transmittal of a Notice of Electronic Filing to all ECF registrants.

5

6                                          */s/ Craig W. Smith*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28